**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**WESTERN TEMPORARY SERVICES, INC. and the Classic Company, Inc., Respondents.**

No. 86-1624.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 5, 1986.

Decided May 20, 1987.

Victoria A. Higman, NLRB, Washington, D.C., for petitioner.

George T. Dodd, Baker, Daniels & Shoaff, James P. Fenton, O'Hara, Barrett, Barrett & McNagny, Ft. Wayne, Ind., for respondents.

Before CUDAHY, POSNER and EASTERBROOK, Circuit Judges.

CUDAHY, Circuit Judge.

This case comes before us on the application of the National Labor Relations Board (the "NLRB" or the "Board") for enforcement of its unfair labor practice order issued against Western Temporary Services, Inc. ("Western") and The Classic Company, Inc. ("Classic") as joint employers. Classic and Western oppose the application on a number of grounds. They claim that they were denied due process in the representation proceeding, and they also challenge the NLRB's finding of joint employer status as well as the Board's inclusion of part-time employees in the bargaining unit. For the reasons discussed below, we order enforcement of the NLRB's order.

## I.

Classic operates a production facility in Fort Wayne, Indiana and is engaged in the wholesale sale and distribution of bowling supplies, including embroidered team shirts, engraved trophies and screen-printed T-shirts. Classic also operates a small retail outlet for its products in Fort Wayne. Each product assembled and distributed by Classic has a different period of peak production. Prior to October 1982, Classic used temporary or part-time employees during periods of peak production to supplement its permanent full-time production work force of 50 to 60 employees. Classic directly hired some of these part-time employees and hired others through temporary employment services such as Western. Western is a local supplier of employees on a temporary basis in the secretarial and light industrial fields. In October 1982, Classic had 32 part-time employees on its own payroll.

On October 13, 1982, officials of Classic met with all of its employees, full-time and part-time, to explain why it would not be granting a wage increase that year. During this meeting, the part-time employees brought their grievances to the attention of Classic officials; these employees wanted the same fringe benefits accorded the full-time staff as well as more hours of work. Transcript of Nov. 30, 1982 Proceeding at 75 ("Tr. of Nov. 30 Proc."). On October 15,

Classic entered into an agreement with Western under which Western would supply all Classic's temporary help needs. The agreement, which took effect on October 18, also provided that "existing temporary personnel now used by Classic Company shall be transferred to the payroll of Western Temporary Services, Inc." On October 19, Marlys Schommer, the manager of Western, interviewed Classic's 32 part-time employees for employment with Western. All but five accepted employment with Western at $3.35 per hour, the same rate they had been paid by Classic. *Id.* at 49. This is also the rate paid the full-time employees at Classic, except for those occupying full-time positions requiring special skills.

Classic and Western agreed that Western would accord former Classic employees preference for work at Classic. When Western receives a request for workers from Classic, former Classic employees are contacted first. Other Western employees are contacted only if there are insufficient numbers of former Classic employees available. *Id.* at 21. Not only does Western give preference to former Classic employees in general, but if Classic requests particular employees by name, which it frequently does, Western attempts to honor these requests. *Id.* at 50. Classic also has the right to ask that a particular employee not be referred to it, and in that event, Western will comply with such a request. Western charges Classic a flat fee of $4.60 per employee per hour from which Western pays the employee and covers the costs of social security, unemployment and other insurance, fringe benefits and overhead. *Id.* at 37. The part-time employees' benefits, including vacation, are determined by Western. Classic determines their conditions of work and work assignments. Part-time employees use the same facilities, work in the same areas, perform many of the same tasks (most of which are unskilled) and are subject to the same supervision as Classic's full-time employees. *Id.* at 103–05, 110, 155–56. Their hours are verified on Western time slips by Classic supervisors before they receive their paychecks from Western. *Id.* at 51–52. At

the time the Classic employees were transferred to Western's payroll, Classic announced that it would maintain its policy of considering part-time employees for full-time positions. *Id.* at 110. This reshuffling of employees triggered a number of proceedings before the NLRB.

The Indiana Joint Board of the Retail, Wholesale and Department Store Union, AFL–CIO (the "Union") filed a charge against Classic on October 25, 1982, alleging that Classic's transfer of employees and other tactics were an attempt to discourage membership in the Union and destroy its majority status. Western was not named in the charge. On November 12, 1982, the NLRB issued a complaint against Classic as respondent and Western as a party-in-interest, alleging them to be joint employers. The complaint also claimed that Classic had violated sections 8(a)(1) and (3) of the NLRA, 29 U.S.C. §§ 158(a)(1), 158(a)(3), by interrogating its employees regarding their union activities, soliciting grievances and promising improved benefits during the October 13 meeting with its employees, granting increased benefits and discharging its part-time employees on October 15; in addition, Classic and Western were alleged to have committed the same violation by jointly re-hiring these employees on October 19 without fully reinstating them to their former positions. The NLRB issued an order dated November 18, 1982, scheduling a January 1983 hearing on the complaint. The Board issued an amended complaint on December 18, 1982 naming Western as a respondent.[1]

On October 18, 1982, the Union filed a petition with the Board for a representation election in a unit of all regular full-time and part-time employees of Classic, excluding office clerical and technical employees and guards and supervisors. Classic received notice on November 17 that a hearing on this petition would be held on November 30. The Union amended its petition on November 29 to name Western and Classic as joint employers. On November

30, a hearing was held on the representation petition. Neither Classic nor Western was notified prior to the representation hearing that their status as joint employers would be an issue at the hearing. Classic first learned that the petition had been amended to include this issue at the November 30 hearing. Western also first received notice on November 30 of its joinder as a respondent in the representation hearing. Although one of Western's managers was present as a prospective witness for Classic, Western was not represented by counsel. At the hearing, Classic opposed both the inclusion of the part-time employees in the bargaining unit and the characterization of it and Western as joint employers. Classic moved for a continuance, claiming that the amended petition did not afford it and Western timely notice of the joint employer allegation. Tr. of Nov. 30 Proc. at 7. Classic's motion was denied. Classic renewed in its post-hearing brief its objection to the denial of its continuance.

The Regional Director issued a decision and direction of election on February 2, 1983, which concluded that Classic and Western were joint employers and that the unit of full-time and part-time employees, including those transferred from Classic's payroll to Western's, was an appropriate bargaining unit. The Regional Director also found that Classic and Western were not denied due process by consideration of the joint employer issue because: (1) the original representation petition, which Western received on November 18, 1982, covered categories of workers that were now supplied to Classic by Western; (2) the separate unfair labor practice complaint, issued on November 12, 1982, specifically alleged that Western and Classic were joint employers; and (3) Classic never claimed that the alleged due process violation resulted in an incomplete record or in the omission of any specific evidence relevant to the issues. Western, for its part, never objected to the representation proceedings. Decision and Direction of Election, No. 25–

---

1. This complaint was resolved when Classic and Western entered into an informal settlement agreement with the Board on May 31, 1983.

RC–7862, at 3 n. 2 (Feb. 2, 1983). Classic subsequently filed with the NLRB a request for review of the Regional Director's decision, challenging the finding of joint employer status and the definition of the appropriate bargaining unit. Classic also claimed that it was denied due process because it had not received prior notice of the joint employer issue. Western did not file a request for review or an objection.

While Classic's request for review was pending, an election was conducted in the designated unit on March 4, 1983, with the part-time employees casting challenged ballots. The counting of votes was delayed pending the Board's consideration of Classic's request for review of the Regional Director's decision. On August 23, 1983, the NLRB granted that portion of Classic's request for review that challenged the inclusion of part-time employees in the unit, and it denied review of all other issues. The Board issued an order on January 4, 1984, establishing an eligibility formula for the part-time employees. Under this formula, only those part-time employees supplied to Classic by Western who worked at least an average of four hours per week during the six months immediately preceding the election eligibility date (February 9, 1983) were eligible to vote.

The Regional Director counted the ballots on January 26, 1984. His tally showed 27 votes for the Union, 16 against, and 44 challenged ballots. Classic and Western were supplied with a list of the challenged voters, and the Regional Director solicited their positions as to each voter. Classic objected to the inclusion of part-time workers. The Regional Director issued a supplemental decision and order on February 29 in which he ordered that the ballots of those part-time employees who met the Board's eligibility formula be opened and counted. The Regional Director also directed that a hearing on the eligibility of the remaining challenged voters be held if their votes were determinative. On March 9, Classic and Western requested that the Board review the Regional Director's supplemental decision and order; the Board denied this request on May 23. The Regional Director then issued a revised tally,

showing 42 votes for the Union, 23 against and 17 challenged votes which were not determinative. On June 28, 1984, the Regional Director certified the Union as the employees' exclusive bargaining representative.

Classic and Western rejected a July 2, 1984 demand for bargaining, and the Union commenced this unfair labor practice proceeding. A consolidated complaint was issued by the Regional Director, alleging that the employers had refused to recognize and bargain with the Union in violation of sections 8(a)(5) and (1) of the NLRA, 29 U.S.C. §§ 158(a)(5), 158(a)(1). Classic and Western filed answers denying their joint employer status. Classic amended its answer to include its claim that it had been denied due process in the representation hearing by not receiving prior notice that its status as a joint employer would be at issue. Classic's amended answer also alleged that employee turnover subsequent to the election relieved it of its duty to bargain. Western did not raise either the due process or the changed circumstance claim before the NLRB. The General Counsel filed a summary judgment motion with the Board as well as a motion to strike the employers' answer. The General Counsel's position was that the employers were attempting to relitigate issues that had already been decided in the representation proceeding, which could not be relitigated in a subsequent unfair labor practice proceeding. The General Counsel also argued that there were no disputed issues of fact and that a hearing was therefore unnecessary. The Board denied the General Counsel's motions on the ground that the complaint and answer had raised factual issues not otherwise identified by the Board, and remanded the case for a hearing.

A hearing was then held before an administrative law judge ("ALJ") on December 17, 1984. The ALJ permitted Western to introduce evidence on the joint employer issue, but he then granted the General Counsel's motion to strike this evidence on the grounds that it was irrelevant and did not constitute newly discovered evidence. Classic did not introduce any evidence.

The General Counsel also renewed his motion to strike those portions of the employers' answers which denied that Classic and Western were joint employers and which contested the appropriateness of the designated bargaining unit. The ALJ granted from the bench the motion to strike, finding that the Board had previously addressed these issues in the representation case and that the prior determinations were *res judicata* in the unfair labor practice proceeding.

The General Counsel also renewed his motion for judgment on the pleadings. The ALJ granted this motion, holding that the issues of joint employer status, unit description and due process had been finally decided in the representation hearing and that the extent of temporary employee turnover at Classic subsequent to the earlier hearing was immaterial. Because the employers had admitted rejecting the bargaining demand, the ALJ entered a cease-and-desist order against Classic and Western finding that their refusal to bargain violated the NLRA.

Classic and Western filed exceptions to the ALJ's decision. The NLRB delegated its authority to consider these exceptions to a three-member panel which affirmed the decision of the ALJ and adopted his recommended order as the order of the Board. *Western Temporary Services, Inc. and The Classic Company, Inc.*, 278 NLRB No. 73 (1986). The panel specifically rejected the due process argument because: (1) prior to the representation hearing, the General Counsel had issued an unfair labor practice complaint alleging that Classic and Western were joint employers; (2) Western's answer to the complaint in the present case, although denying joint employer status, admitted sufficient facts to establish that it and Classic were joint employers; and (3) Classic was able to present evidence on the joint employer issue at the representation hearing. *Id.* pp. 1–2 n. 1. The NLRB applied to this court for enforcement of its order.

Classic and Western raise here a number of objections to the order. Their most substantial claim is the allegation that they were deprived of their right to due process because of the NLRB's failure to give them prior notice that their status as joint employers would be litigated during the November 30 representation hearing. We believe that Western waived its right to raise a due process objection here and that Classic was not prejudiced by the lack of prior notice because it had adequate opportunity subsequent to the hearing to present its evidence. We also find that the Board's determination of joint employer status, as well as its definition of the bargaining unit, are supported by substantial evidence in the record. Classic's and Western's contention that the turnover in part-time employees subsequent to the election relieves them of their obligation to bargain is without merit.

### II.

Classic and Western contend on appeal that the fact that they did not receive prior notice that their status as joint employers would be an issue in the representation hearing deprived them of due process. Western argues that it did not have an adequate opportunity to prepare for and participate in the November 30 hearing with respect to any issue because Western was not named as a defendant in the original representation petition. Classic's position is that, although it was a named defendant in the initial petition and was notified that it would have to contest the Union's proposed bargaining unit, it was not given adequate notice that the joint employer issue would also be determined.

The NLRB argues that the requirements of due process were satisfied because Classic and Western had constructive notice that they were alleged to be joint employers: Both employers received the unfair labor practice complaint, dated November 12, 1982, which alleged that they were joint employers, and they both also received the original representation petition which proposed that the bargaining unit include employees who were subsequently transferred to Western.

■ We agree with Western's position that "notice on the day of the hearing is

not reasonable notice." *NLRB v. Jordan Bus Co.*, 380 F.2d 219, 223 (10th Cir.1967); *see also Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) (fundamental requirement of due process is notice that "afford[s] a reasonable time for those interested to make their appearance") (citations omitted). Although the unfair labor practice complaint dated November 12, 1982 alleged that Classic and Western were joint employers, the NLRB had scheduled a hearing on the allegations in that complaint for January 1983; the Board cannot seriously contend that Western should have been apprised by this notice of the need to defend itself on the joint employer issue at the November 30 hearing. Nor does the fact that the first representation petition sought to include employees subsequently employed by Western provide adequate notice to that company that its status as a joint employer would be litigated at the hearing on that petition. The petition was filed the day before the part-time employees were transferred to Western, and the petition named only Classic as the employer.

■ We conclude, however, that Western waived its right to raise a due process claim here because of its failure to bring a timely objection to the lack of prior notice. Western did not raise any objection until March 1984, approximately fifteen months after it received a copy of the amended petition naming it as a joint employer and after the representation hearing had been held. Western did not file a request for review of the Regional Director's February 2, 1983 decision rejecting Classic's due process claim nor did Western file motions either to reopen the November 30, 1982 hearing or to supplement the record with evidence bearing on the joint employer issue.[2] In March 1984, Western requested that the Board review the Regional Director's supplemental decision determining the number of part-time employees who met the Board's eligibility formula. Western did not specifically complain at that time about the lack of prior notice; it simply argued that the conduct of the representation hearing denied Western due process. Western also failed to raise its due process claim in its answer to the unfair labor practice complaint that was issued after it refused to bargain.

■ Western argues on appeal that "due process arguments are not waived where eventual review has been sought." Brief of Respondent Western at 24. Apparently, Western believes that a defense based on lack of prior notice cannot be waived so long as a litigant eventually raises it sometime in the proceedings. The due process clause, however, is not violated by requiring a party to raise a defense based on lack of proper notice within a reasonable period after he becomes aware of the procedural default. *Cf.* 5 Wright & Miller, *Federal Practice and Procedure* § 1391, at 377 (1986 Supp.) ("[w]hen the party has received actual notice of the suit, there is no due process problem in requiring him to object to the ineffective service within the period prescribed by Rule 12(h)").[3]

2. Western did not even bother to hire an attorney until one week before the December 1984 unfair labor practice hearing before the ALJ, despite the fact that Western was named a respondent in the amended unfair labor practice charge served on Western on or about December 20, 1982 and in the amended representation complaint Western received on November 30, 1982. Until late 1984, Western apparently intended to rely on Classic to defend its interests.

3. The cases Western cites do not help its argument in the least. In *NLRB v. Trancoa Chemical Corp.*, 303 F.2d 456 (1st Cir.1962), the court reviewed a Board determination that misleading union campaign literature did not impair the employees' freedom of choice. Waiver was simply not an issue in that case because the employer in *Trancoa*, unlike Western, raised timely objections to the misrepresentations.

*International House v. NLRB*, 676 F.2d 906 (2d Cir.1982), is also inapposite, though at least waiver was discussed in that case. International House operated a residence facility and contracted with DAKA to supply dining service. A union attempted to organize the cafeteria workers. During the representation proceeding, DAKA and the union specifically disclaimed any intention of establishing that International House was a joint employer. After the union won the election, it sought to negotiate only with DAKA. International House was first alleged to be a joint employer in an unfair labor practice charge filed by the union after International House terminated its contract with

■ Western also was not prejudiced by the lack of prior notice. Western was given an opportunity to present its uncontroverted evidence on the joint employer issue before the ALJ in the proceedings below. Although the ALJ struck this evidence on motion of the General Counsel, the evidence remains in the record for purposes of appeal, Transcript of Dec. 17, 1984 Proceeding at 65–66 ("Tr. of Dec. 17 Proc."), and it does not require overturning the NLRB's decision finding Classic and Western to be joint employers. *Infra* pp. 1266–67.

■ Unlike Western, Classic did raise timely objections to the lack of prior notice. Thus, Classic has not waived its right to raise its due process claim here. We find, however, that Classic, like Western, was not prejudiced by the inadequate notice. It is not clear to us precisely how the decision of the NLRB on the joint employer issue hurt Classic. Classic's only concern would seem to be whether the part-time employees are included in the bargaining unit. If they are included, Classic must negotiate with the Union with respect to them to the extent it controls their conditions of employment. Including Western as a joint employer does not appear to harm Classic; it simply allows the Union to negotiate with Western with respect to the employment conditions Western controls. In addition, although Classic was not apprised of the fact that the joint employer issue would be considered at the November 30 hearing until its representatives were actually at the hearing, Classic did present evidence on this question at that time, and it has never claimed that the lack of notice resulted in an incomplete record. Neither Classic's requests for review of the Regional Director's decisions nor its briefing on appeal allege specific facts that contradict the finding of joint employer status. Classic (and Western) also conceded at oral argument that there is no evidence that could have been presented at the November 30 hearing that cannot be presented now due, for example, to the destruction of documents or the death of witnesses in the interim.[4] The joint employer issue in this case does not turn upon allegedly erroneous or incomplete factual determinations; no one contends that all the *relevant* facts are not in the record, and no one contests these facts.[5] The question presented is the proper characterization of these facts. Remanding this case for further hearings would be an empty gesture.[6]

DAKA. The union attempted to charge International House with unfair labor practices that occurred before it had any opportunity to litigate its status as a joint employer. The court, however, declined to resolve the due process issue because it concluded that the Board erred in determining that DAKA and International House were joint employers.

4. The situation presented here is very similar to the facts of *NLRB v. Jordan Bus Co.*, 380 F.2d 219 (10th Cir.1967). In that case, a hearing was held to determine if Jordan and Denco were joint employers. Denco, however, did not receive notice of the proceeding until the morning of the hearing. Denco was able to appear at the hearing through counsel, and its attorney at that time objected to the lack of prior notice. Jordan and Denco were found to be joint employers, and the case was eventually appealed to the Tenth Circuit. That court rejected Denco's due process claim because it did "not appear that Denco at any time ... stated a desire to introduce evidence which would in any way do violence to the findings based on the evidence in the record." *Id.* at 223.

5. Western does claim that additional evidence regarding "the numbers of employees, average hours worked and rotation of employees in and out of assignments at Classic and elsewhere would have been open for review" at the November 30 hearing if it had received timely notice. Brief of Respondent Western at 34. These facts, however, are not relevant to the issue of joint employer status. This evidence also would not have been available at the time of the representation hearing because Western had been referring part-time employees to Classic on a regular basis only since the previous month. In addition, in defining the relevant unit, the Board did have before it an exhibit introduced by Classic during the representation hearing which summarized the hours worked on a weekly basis from October 1981 till October 1982 for the 32 part-time workers employed by Classic as of October 15, 1982.

6. Classic and Western also claim that the NLRB violated its own regulations by failing to provide them with prior notice of the hearing. The relevant regulation provides that after a representation petition has been filed, "the Regional Director shall prepare and cause to be served upon the parties ... a notice of hearing before a hearing officer at a time and place fixed therein." 29 C.F.R. § 102.63(a) (1986). For the same

### III.

The question we now at last consider is whether the NLRB correctly determined the issue of joint employer status. Classic contends that the NLRB applied the wrong standard to determine joint employer status, and both Classic and Western argue that the evidence does not support the Board's findings on the joint employer issue.

### A.

Classic argues that joint employer status is indicated by the existence of a formal relationship between the employers as well as by the control exercised by each employer over the employees. It contends that the Board erred by considering only the latter factor.

■■■ The employer's formulation of the appropriate standard is based on cases that blur the distinct concepts of "single employer" and "joint employer." Single employer status "exists where two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a 'single employer.'" *NLRB v. Browning-Ferris Indus., Inc.*, 691 F.2d 1117, 1122 (3d Cir. 1982). Factors which establish a formal relationship between the two employers, such as common ownership or common management, are relevant to determine whether two seemingly independent businesses are really one enterprise. The joint employer concept, by contrast, is not based on the integration of two companies but instead looks to the control two separate companies exert over the same employees. *See, e.g., Boire v. Greyhound Corp.*, 376 U.S. 473, 481, 84 S.Ct. 894, 898, 11 L.Ed.2d 849 (1964). Although the distinction between these two concepts has not always been maintained by the courts or by the NLRB,[7] we conclude that the Board applied the appropriate standard in this case: joint

employer status exists if two employers "'exert significant control over the same employees.'" Brief of Petitioner at 14 (quoting *Lutheran Welfare Servs. v. NLRB*, 607 F.2d 777, 778 (7th Cir.1979)).

### B.

The Board's application of this standard presents an issue of fact and should be sustained if "'substantial evidence in the record supports the Board's finding.'" *Davis v. NLRB*, 617 F.2d 1264, 1271 (7th Cir.1980) (quoting *NLRB v. Sure-Tan, Inc.*, 583 F.2d 355, 358 (7th Cir.1978)). We conclude that there is ample support in the record for the Board's conclusion that Classic and Western are joint employers.

■■ Classic and Western determine the essential terms and conditions of the part-time workers' employment. Classic exercises a great deal of control over which part-time employees work for it. Although Western hires and fires the part-time employees whom it maintains on its roster, Western hired every former part-time employee of Classic who agreed to the new employment arrangement (27 of 32). If Classic refuses a referral, Western will not send that employee to Classic (or to any other employer) in the future. Tr. of Nov. 30 Proc. at 59. In referring employees to Classic, Western first contacts the particular employees requested by Classic and then any available former Classic employees. Western sends other employees only if Classic's needs cannot be met by the requested workers and by former Classic employees. Western also honors Classic's requests to have particular employees work consecutive days.

In addition to its power over the identity of the part-time employees who work for it, Classic has exclusive control over the day-to-day activities of the part-time workers who are referred to it. Classic trains, assigns work, and supervises them. The

---

reasons that we reject Western's and Classic's due process argument, we also reject their claim under this regulation.

**7.** *See, e.g., Pulitzer Pub. Co. v. NLRB*, 618 F.2d 1275, 1278–79 (8th Cir.), *cert. denied*, 449 U.S.

875, 101 S.Ct. 217, 66 L.Ed.2d 96 (1980); *Parklane Hosiery Co., Inc.*, 203 NLRB 597, 612, *amended on other grounds*, 207 NLRB 991 (1973).

part-time workers punch Classic's time clock and fill out its time cards. The number of hours worked, including any overtime, is determined by Classic. *See Carrier Corp. v. NLRB,* 768 F.2d 778, 781 (6th Cir.1985) (employer was a joint employer because it exercised substantial day-to-day control over referred employees, consulted with referral agency over wages and fringe benefits, had the authority to reject an employee and could direct referral company to remove an employee).

Western's responsibilities over the part-time employees are also substantial, although essentially administrative in nature. Western contacts the employees on its roster for referral to Classic, and it also issues the part-time employees their paychecks after Classic supervisors verify their hours on Western time slips. Although Western sets vacation policy and determines the level of other benefits, the part-time employees' rate of pay is the same as that formerly paid by Classic. Western charges Classic a flat rate per hour per employee, which includes the wages paid the employee plus an amount negotiated with Classic sufficient to cover employee benefits, social security, unemployment, other insurance and Western's overhead. Decision and Direction of Election, at 2 n. 1.[8]

## IV.

Classic and Western also argue on appeal that the Board's definition of the bargaining unit is arbitrary and capricious. Although not entirely clear from their briefs, they apparently attack the inclusion of any part-time employees in the unit as well as the Board's ascertainment of which part-time employees are eligible to vote. They also argue that the Board's eligibility formula is so ambiguous that we should not order its enforcement. We reject all of these challenges.

## A.

The NLRA vests the Board with "primary responsibility for determining the appropriateness of a collective bargaining unit...." *Justak Bros. and Co. v. NLRB,* 664 F.2d 1074, 1079 (7th Cir.1981). The Board's unit determination is reviewed under an abuse of discretion standard. *See, e.g., id.; NLRB v. Gogin,* 575 F.2d 596, 603 (7th Cir.1978); *State Farm Mutual Auto. Ins. Co. v. NLRB,* 411 F.2d 356, 358 (7th Cir.) *(en banc),* cert. denied, 396 U.S. 832, 90 S.Ct. 87, 24 L.Ed.2d 83 (1969). The standard is not whether the Board has picked the most appropriate bargaining unit but whether the unit selected is appropriate under all the circumstances. *See, e.g., Friendly Ice Cream Corp. v. NLRB,* 705 F.2d 570, 574 (1st Cir.1983); *Daylight Grocery Co., Inc. v. NLRB,* 678 F.2d 905, 908 (11th Cir.1982); *NLRB v. Hudson River Aggregates,* 639 F.2d 865, 871 (2d Cir. 1981). The burden of proof is on the employers to show that the Board's unit is clearly inappropriate. *Friendly Ice Cream,* 705 F.2d at 574.

Classic and Western argue that the part-time employees do not share the requisite "community of interest" with Classic's full-time employees.[9] They claim that this con-

---

**8.** Classic's and Western's claim that *Laerco Transp. and Warehouse,* 269 NLRB 324 (1984), is inconsistent with a finding here of joint employer status is without merit. In *Laerco,* the Board concluded that CTL and Laerco were not joint employers, in part, because of the minimal supervision by Laerco of CTL-referred drivers; Laerco simply provided initial directions to the drivers regarding the routes to be followed. Here, by contrast, the part-time employees work at Classic's facility and are subject to continual supervision by Classic. Laerco also apparently had no control over the wages paid its CTL drivers. More important, the only issue we are faced with here is determining whether the Board's decision in this case is supported by substantial evidence, not whether the Board

might have found joint employer status in some other case. *Carrier Corp. v. NLRB,* 768 F.2d 778, 782 n. 1 (6th Cir.1985).

Contrary to Classic's and Western's claim, the fact that the number of part-time employees referred to Classic at any one time never exceeded the number of full-time employees has no legal relevance to the joint employer issue. The shared control over the part-time employees is the key.

**9.** It is of some interest that in this case the parties' usual roles in the unit-determination issue are reversed. As this court noted in *NLRB v. Res-Care, Inc.,* 705 F.2d 1461, 1469 (7th Cir. 1983), "[e]mployers generally prefer fewer rather than more collective bargaining units be-

tention is supported by the following factors: part-time employees have no expectation of future employment with Classic, are employed on an irregular basis and for an insufficient number of hours, experience a high rate of turnover and are not accorded the same benefits as full-time employees.

The companies' claim that the part-time employees have no expectation of future employment with Classic is simply groundless. Former Classic employees are given preference for work at Classic, and in practice, Western does contact these employees first. Fifteen of the twenty-two part-time employees eligible to vote are former Classic employees. Classic also frequently requests particular employees by name who have previously worked for Classic, Tr. of Nov. 30 Proc. at 33, 50, and Western always attempts to honor such requests. Thus, those employees with experience at Classic may reasonably expect to work for that company in the future. *See, e.g., Baumer Foods, Inc.,* 190 NLRB 690 (1971) (seasonal employees were included in the same bargaining unit as the full-time employees in part because the employer gave preference in hiring to former seasonals and many returned each year). In addition, prior to the transfer of its part-time employees to Western, Classic had a policy of promoting its part-time employees to full-time positions, and at the time of the transfer, Classic announced to its employees that it would maintain this policy. Tr. of Nov. 30 Proc. at 110. By contrast, in *L & B Cooling, Inc.,* 267 NLRB 1 (1983), *enf'd,* 757 F.2d 236 (10th Cir.1985), on which both Classic and Western heavily rely, there was no evidence that the employer encouraged the extra seasonal employees to reapply for employment; it simply hired whoever was available.

Additionally, the employers ignore the factors that suggest that the part-time and full-time employees have sufficiently overlapping interests to justify the inclusion of both in the same bargaining unit. Both types of employees are subject to common supervision, *see Daylight Grocery,* 678 F.2d at 908; *NLRB v. Bayliss Trucking Corp.,* 432 F.2d 1025, 1028 (2d Cir.1970), and the same working conditions. They eat in the same lunchroom, punch the same time clock and use the same facilities. Although the part-time employees do not normally perform the more skilled jobs for Classic, the part-time and full-time employees perform essentially the same tasks. *See International Union v. NLRB,* 231 F.2d 237, 243 (7th Cir.), *cert. denied,* 352 U.S. 908, 77 S.Ct. 146, 1 L.Ed.2d 117 (1956). The work of the part-time employees is functionally integrated with that of the full-time workers in that both classes of employees work together on their tasks, *see Daylight Grocery,* 678 F.2d at 908, and both classes receive approximately the same wages. The fact that part-time and full-time employees do not receive the same fringe benefits does not, by itself, support excluding them from a bargaining unit. *See Quigley Indus. Inc.,* 180 NLRB 486 (1969); *SCOA, Inc.,* 140 NLRB 1379, 1381 (1963).

The evidence also does not support the employers' contention that the rate of turnover of the part-time employees is so extreme that it precludes the formation of a group of employees with a continuing and substantial interest in their working conditions at Classic. Of the twenty-six part-time employees who fell within the Board's eligibility formula, only four were challenged on the basis that their employment at Classic terminated prior to the election. And fifteen of the twenty-two eligible part-time employees had worked directly for Classic prior to their transfer to Western.

Also without merit is the employers' contention that the hours worked by the part-

cause the more units there are the fewer workers have to agree in order to call a strike." Unions, on the other hand, prefer units of homogeneous composition to minimize conflict within the unit, and homogeneity is likely to increase as the size of the unit decreases. *Id.* Western and Classic apparently object to the inclusion of the part-time employees in the unit because they believe that these employees do not have a great stake in their working conditions and therefore will not exercise their vote responsibly. We address this objection *infra* pp. 1268–69.

time employees are too irregular to justify their inclusion in the unit. Classic's trophy and bowling supply businesses are both seasonal. The peak period for bowling supplies is during the fall, and trophies are in demand in the spring and early summer months. Classic's T-shirt business is not seasonal, but it fluctuates unpredictably throughout the year. The Board has recognized that sporadic as well as seasonal employees may be permitted to vote in representation elections. *See NLRB v. Atkinson Dredging Co.*, 329 F.2d 158, 162 (4th Cir.) (citing cases), *cert. denied*, 377 U.S. 965, 84 S.Ct. 1647, 12 L.Ed.2d 736 (1964). In cases considering whether part-time employees should be included within a bargaining unit,

> the Board determines unit inclusion on the basis of whether the employee is regularly employed for sufficient periods of time to demonstrate that he, along with the full-time employees, has a substantial interest in the unit's wages, hours, and conditions of employment.

*Berea Publishing Co.*, 140 NLRB 516, 518–19 (1963) (footnote omitted).

▮ In the case before us, although the employment of the part-time employees fluctuates, we agree with the Board's conclusion "that a substantial number of part-time employees work significant hours 'fairly regularly' over a period of months demonstrat[ing] an interest in working conditions" sufficient to justify their inclusion in the bargaining unit. Brief of Petitioner at 30. The Board did not abuse its discretion in enfranchising those employees who worked an average of four hours per week over the six-month period preceding the eligibility date.

Although a four-hour-a-week rule may not be appropriate in every case to determine which part-time employees should be permitted to vote, its application here does identify those employees who put in a sufficiently large number of total hours. During the six-month period prior to the eligibility date, the twenty-two part-time employees included in the bargaining unit worked an average of fifteen weeks out of a total of twenty-six weeks, ranging from six weeks to twenty-six weeks, and they averaged twenty-nine hours per week during the weeks they worked.

Both employers also object to a six-month eligibility period since such a time frame supposedly enfranchises persons who may not have worked recently at Classic. We think this contention lacks merit. The six-month period is appropriate in this case because it accommodates the seasonal nature of the part-timers' employment. The rule adopted by the Board captures those employees who worked a substantial number of hours during a concentrated period but who are not employed at all by Classic during some weeks. A shorter eligibility period running through a period of peak employment of part-timers might pick up those persons who work for a substantial number of hours but for a very short term. An extended measuring period, such as that adopted by the Board here, is more likely to identify people with a sufficient attachment to the labor force of a particular employer.

### B.

▮ Classic also contends that the Board's order defining which part-time employees are eligible to vote is so ambiguous that we should not order its enforcement. The Board ordered that the votes of those part-time employees "who worked for at least an average of 4 hours per week during the 6 months period immediately preceding the eligibility date for the election" should be counted. The Regional Director interpreted this order to mean that those part-time employees who worked 104 hours over the six-month period (an average of four hours per week) were eligible to vote. Twenty-two part-time employees were considered eligible voters under this interpretation. Classic argues that the order could also be interpreted to mean that voter eligibility is limited to those part-time employees who worked four hours *each* week during the six months preceding the eligibility date for the election. Under Classic's interpretation, only one part-time employee would be allowed to vote. Brief of Respondent Classic at 37–38.

We do not find the NLRB's order to be ambiguous. The order defines eligible part-time employees as those who work "at least *an average of four hours per week*" during the relevant six-month period. "[A]n average of four hours per week" means an *average*, not that an employee must work four hours *each* week. The Regional Director interpreted the order to mean an average, and we think that this interpretation is the one best supported by the language of the order. The Regional Director's interpretation also accommodates the seasonal nature of Classic's work.

## V.

◼ The final argument raised by Classic is that the turnover of employees during the seventeen months that elapsed between the election and the date of certification of the Union relieves Classic of its duty to bargain because it is not clear that the Union now represents a majority of full-time and part-time employees. The delay in certifying the Union was due to the Board's consideration of Classic's request for review of the Regional Director's decision and direction of election as well as its consideration of Classic's and Western's request for review of the Regional Director's supplemental decision. The ALJ, on remand from the Board, took evidence on this point but later struck the evidence on the General Counsel's motion that changed circumstances was not an issue in this case. Tr. of Dec. 17 Proc. at 64–66.

Classic has cited cases in which courts declined to order enforcement of a bargaining order because of significant employee turnover. *NLRB v. Knogo Corp.*, 727 F.2d 55 (2d Cir.1984); *NLRB v. Marion Rohr Corp., Inc.*, 714 F.2d 228 (2d Cir.1983). Those cases, however, arose in a completely different context from that presented here. *Knogo* and *Marion Rohr* involved *"Gissel"* bargaining orders. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Although the unions in those cases had not won an election, the Board ordered the employers to bargain because the employers' unfair labor practices precluded the holding of a fair election after a majority of the employees had signed authorization cards. (In *Marion Rohr*, the NLRB conceded on appeal that the union never had authorization cards from a majority of the employees.) In *Marion Rohr* and *Knogo*, the courts held that the Board must consider employee turnover subsequent to the signing of the authorization cards before the Board imposes the extraordinary remedy of a bargaining order rather than ordering an election. In this case, by contrast, the Board issued a bargaining order after the Union had been certified on the basis of an election.

Simple lapse of time is not a sufficient reason to relieve an employer of its duty to bargain. *NLRB v. L.B. Foster*, 418 F.2d 1, 4 (9th Cir.1969), *cert. denied*, 397 U.S. 990, 90 S.Ct. 1124, 25 L.Ed.2d 398 (1970). The cases also suggest that post-election employee turnover by itself does not lead to a presumption that a union has lost majority support among the workers. *See, e.g., Dynamic Mach. Co. v. NLRB*, 552 F.2d 1195, 1199 & n. 5, 1205 (7th Cir.), *cert. denied*, 434 U.S. 827, 98 S.Ct. 103, 54 L.Ed.2d 85 (1977); *Zim's Foodliner, Inc. v. N.L.R.B.*, 495 F.2d 1131, 1141 (7th Cir.) ("[n]umerous cases hold that employee turnover, standing alone, does not give rise to good faith doubts regarding a union's majority status"), *cert. denied*, 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 65 (1974); *L.B. Foster*, 418 F.2d at 5; *NLRB v. Little Rock Downtowner, Inc.*, 414 F.2d 1084, 1091 (8th Cir. 1969). Contrary presumptions might encourage employers to file unmeritorious motions in the hope of eventually being relieved of their duty to bargain, either through sheer lapse of time or through inevitable employee turnover.

Order Enforced.