857 F.2d 1475
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES AVIEX COMPANY, Petitioner, Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.
 Nos. 87-6093, 87-6231.
 United States Court of Appeals, Sixth Circuit.
 Sept. 2, 1988.
 
 Before BOYCE F. MARTIN, Jr., RALPH B. GUY Jr., and DAVID A. NELSON, Circuit Judges.
 PER CURIAM.
 
 
 1
 Petitioner United States Aviex Company seeks review of a decision and order of the National Labor Relations Board finding that Aviex committed an unfair labor practice by refusing to bargain with the International Union of Electronic, Electrical, Technical, Salaried and Machine Workers, AFL-CIO, and requiring Aviex to bargain with the union. The Board seeks enforcement of the order. The order rests on an earlier Board decision rejecting ballot challenges and objections filed after a representation election won by the union. Finding substantial evidence in the record to support the decision, we shall grant enforcement.
 
 
 2
 * Petitioner, a privately-held Michigan corporation, manufactures and sells automotive products, including gas line antifreeze, starting fluid and windshield ice remover. About 70 percent of its output consists of products that are highly seasonal. At the beginning of the 1982 winter sales period, the company had about 30 employees; in September and October of that year it added about 15 new production workers. On December 1, 1982, several Aviex employees met with a union representative. The next day the company shut down its production lines and laid off nearly all its production workers.
 
 
 3
 A union representation election was held, by stipulation, on February 17, 1983, with the voting eligibility of the laid off production workers being covered by the following agreement: the most senior five would be allowed to vote without challenge, the most junior five would not be allowed to vote, and the others would be allowed to vote subject to company challenge. Nineteen votes were cast in favor of union representation and seventeen against it. Aviex challenged the five ballots to which challenges were permitted under the agreement.
 
 
 4
 Both the union and Aviex filed objections to the election, and the union also filed a complaint alleging unfair labor practices. The Board consolidated all of these matters, and the case was heard by an administrative law judge. The ALJ found that the company had committed unfair labor practices and that none of the company's objections to the election was well taken. Four of the company's five ballot challenges were overruled. Only the findings with respect to two ballot challenges and two company objections are contested here.
 
 
 5
 Among the ballots challenged by Aviex were those of Ronald Zebell and Marian Glaser, two production employees hired in October and laid off December 2. As to Zebell, the ALJ found that the employee had a reasonable expectation of recall at the time of the election and was therefore eligible to vote. Zebell had been hired for a position that normally continued throughout the winter season. He was not informed that his layoff would be permanent. Furthermore, Aviex's labor needs fluctuated with the unpredictable demand for its products. As to Marian Glaser, the ALJ found that the unpredictable nature of Aviex's labor needs and the company's apparent failure to notify the employee that she had been "terminated" gave her a reasonable expectation of recall as well.
 
 
 6
 The company's objections to the representation election, insofar as relevant here, were based on claimed threats and intimidation by the union's supporters against employee Steve Regenos. Regenos testified that another company employee, Jimmie Brady, had told him on several occasions that he would be "sorry" if he did not join the union. Regenos also testified that another employee had visited him at home and told him to take some union literature or he would "have to hurt" him. The ALJ noted, however, that this incident predated the union's petition seeking representation and thus had no bearing on the fairness of the election. The ALJ concluded that "the facts offered by the Employer fail to show that the asserted threats to employee Regenos created a general atmosphere of fear and reprisal among its employees; indeed it appears Regenos was not coerced into joining the union...."
 
 
 7
 The ALJ recommended that the challenged ballots which were to prove determinative be opened and counted. The Board affirmed the ALJ's findings and conclusions and adopted his recommended order with minor modifications.
 
 
 8
 Of the four newly opened ballots, two were cast on each side, bringing the total to 21 votes for union representation and 19 against. The union was certified, the company refused to bargain, and the Board filed a complaint. The Board's general counsel moved for summary judgment, and the Board granted the motion in a decision and order dated September 16, 1987. The company filed a petition seeking review in this court, and the Board filed a cross-application for enforcement.
 
 II
 
 9
 Employees who have been laid off prior to a representation election are entitled to vote if they have a reasonable expectation of recall within a reasonable time after the election. Kustom Electronics, Inc. v. NLRB, 590 F.2d 817, 821 (10th Cir.1978). In determining whether an employee has such a reasonable expectation of recall, one must look to such factors as "the employer's past experience, the employer's future plans, the circumstances of the layoff, and what the employee was told about the likelihood of recall." Atlas Metal Spinning Co., 266 N.L.R.B. 180 (1983).
 
 
 10
 There was ample evidence to support the ALJ's conclusion that employee Zebell had a reasonable expectation of recall. At trial, Zebell testified that the man who hired him (Andrew Chavous) had told him that as a setup man "[he]'d never be laid off, even when it got slow." He also testified that he had been told that the company needed someone like him to replace the "thick-headed, stupid" man then working in the "3M room." Chavous also testified that he planned to train Zebell to replace the unsatisfactory employee and confirmed that he had told Zebell that "it is the practice of the company ... usually not to lay you off." Supervisor Ervin Stryner testified that there were separate recall lists "for people like set-up people" and that "very seldom did the set-up people or the batchmen get laid off. They always had a job."
 
 
 11
 There was also evidence that the company's winter labor needs generally depended on the availability of materials and the weather, the changeability of which made an expectation of recall reasonable. The company did in fact recall a number of employees in the weeks after the layoff, further supporting the Board's finding. There was no evidence that Zebell was ever told his layoff was permanent, or that he was ever sent a copy of the "termination form" which the company introduced in evidence. Finally, Zebell testified that he was paid by the company to attend two company sponsored election campaign meetings held during working hours after he was laid off. This obviously would support a reasonable expectation that he might be recalled.
 
 
 12
 There was also considerable evidence supporting the Board's finding that employee Marian Glaser had a reasonable expectation of recall. The evidence showing the unpredictable and seasonal nature of the company's business applies with equal force here. So does the evidence showing that the company in fact recalled a number of laid-off workers. As with Zebell, there was no evidence that Glaser was told she could never come back. She too was paid to attend a company sponsored election campaign meeting during working hours after she had been laid off.
 
 
 13
 The company makes little effort to challenge this evidence directly. Instead, it emphasizes the company's distressed economic condition and claims that, under the circumstances, any expectation of recall on its employees' part would have been unreasonable. It also points to employee handbook provisions stating that probationary employees like Zebell and Glaser could not be "recalled" by the company because they had not worked long enough for the company to acquire any "recall rights". At trial, however, there was evidence that no employees had copies of the handbook and that when an employee asked about the handbook at a meeting, "nobody could come up with one...."
 
 
 14
 The principal case relied on by the company, Choc-Ola Bottlers, Inc. v. NLRB, 478 F.2d 461, 462-463 & n. 3 (7th Cir.1973), dealt with an employee who was fired because he had stolen property from his employer, sold it, and kept the money. Obviously, such an employee would not have the same expectation of recall as a laid-off employee in the less awkward position occupied by Zebell and Glaser. Neither the caselaw nor the evidence presented to the ALJ compels the conclusion that Zebell and Glaser did not have a reasonable expectation of recall.
 
 III
 
 15
 The company wants the election overturned on the basis of threats made by other employees to employee Steve Regenos. To succeed on this point, the company must show that there is not substantial evidence in the record to support the Board's finding on the absence of a "general atmosphere of fear and reprisal." See NLRB v. Superior Coatings, Inc., 839 F.2d 1178, 1180 n. 1 (6th Cir.1988).
 
 
 16
 Isolated threats are not necessarily enough to require that an election be overturned. NLRB v. Production Plated Plastics, Inc., 663 F.2d 709, 710 (6th Cir.1981); ATR Wire & Cable Co. v. NLRB, 752 F.2d 201, 202 (6th Cir.1985). It makes a difference whether the threats come from an agent of the union, as defined by traditional agency law principles, or a third party supporter of the union. Threats made by a union agent will require that an election be invalidated if "the threats reasonably tend[ed] to interfere with the employees' free and uncoerced choice in the election." Baja's Place, 268 N.L.R.B. 868 (1984). But threats made by third party supporters of the union, not acting as its agents, must be serious enough to create a "general atmosphere of fear and reprisal such as to render a free choice of representation impossible." Superior Coatings, 839 F.2d at 1180 n. 1. In the instant case there is no evidence that the employees who threatened Regenos had either actual or apparent authority to act on the union's behalf. The ALJ found that the employer had not shown that those employees were union agents, and the company does not explicitly challenge this finding.
 
 
 17
 Two of our cases illustrate the type of third party threats or intimidation that can justify overturning an election. In NLRB v. Mr. Porto, Inc., 590 F.2d 637, 638-39 (6th Cir.1978) this court overturned an election where several union adherents threatened another employee, and a union representative placed nails in the employer's driveway. The close margin of the election was stressed as an important factor. In a more recent case an election was overturned because a union supporter "jumped" a fellow employee who opposed the union and beat him up after earlier threats of violence. The anti-union employee's jeep was also vandalized. Hickman Harbor Service v. NLRB, 739 F.2d 214, 219 (6th Cir.1984).
 
 
 18
 There is evidence in the record of the instant case to support the Board's finding that any threats which occurred were isolated and did not affect the fairness of the election. Employee Regenos testified that on December 8 another employee, David Brown, said that Regenos should take some union campaign materials "and read them and look them over or he would have to hurt me." Regenos also testified that off and on thereafter Brown told Regenos that the "union organizing people knew who their opponents were and we would be sorry if we didn't support this thing." There was testimony that another employee, James Brady, made similar remarks. There is nothing in the record to suggest that any other employees were aware of these comments to Regenos, and there was no evidence of any generalized climate of fear or coercion.
 
 
 19
 The company asserts that such threats "could chill" employee discussion. It points to nothing specific in the record to suggest that this occurred at Aviex, however. Even a single isolated threat by a union supporter could have a "potentially chilling effect," but numerous cases in which Board orders have been affirmed and enforcement has been granted show that such a potential effect, without more, is not enough to render an election invalid. Although the closeness of the union's margin of victory cuts in the company's favor, it is not enough to require rejection of the ALJ's factual findings and conclusions.
 
 IV
 
 20
 The company argues finally that the Board's order should not be enforced because of the lapse of time and employee turnover since the election. This argument is without merit. NLRB v. Western Temporary Services, 821 F.2d 1258, 1270 (7th Cir.1987). To hold otherwise "might encourage employers to file unmeritorious motions in the hope of eventually being relieved of their duty to bargain...." Id. The company has pointed to no evidence that a majority of the new or remaining employees do not support the union. See Fotomat Corp. v. NLRB, 634 F.2d 320, 327 (6th Cir.1980).
 
 
 21
 The cases cited by the company all arise in the context of a Gissel-type bargaining order, an order issued by the Board on the basis of a showing that a majority of employees have signed union authorization cards without any election or certification of the union. See NLRB v. Gissel Packing Co., 395 U.S. 575 (1969). Gissel orders are an extraordinary remedy and may be refused enforcement if the record shows that a majority of current employees no longer supports the union. See, e.g., NLRB v. J. Coty Messenger Service, Inc., 763 F.2d 92, 99-101 (2d Cir.1985); Impact Industries, Inc., v. NLRB, 847 F.2d 379, 383 (7th Cir.1988). In Western Temporary Services, the Seventh Circuit squarely held that the principles applicable in Gissel-type cases provide no basis for refusing to enforce a bargaining order entered after a fair election and certification of the union by the Board. 821 F.2d at 1270.
 
 V
 
 22
 For the foregoing reasons, we grant enforcement of the Board's order.