**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ST. LOUIS COMPREHENSIVE NEIGHBORHOOD HEALTH CENTER, INC., Respondent.**

**No. 79–1960.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 8, 1980.

Decided Nov. 21, 1980.

Linda J. Dreeben, Atty., N.L.R.B., Washington, D. C., for petitioner.

Edward L. Welch, Edwardsville, Ill., for respondent.

Before LAY, Chief Judge, GIBSON, Senior Circuit Judge, and HEANEY, Circuit Judge.

LAY, Chief Judge.

The Board seeks to enforce its order finding the St. Louis Comprehensive Neighborhood Health Center, Inc., (Health Center) violated § 8(a)(5) and (1) of the NLRA by failing to bargain with the Union,[1] by failing to supply relevant and necessary information requested by the Union and by refusing to meet with the Union to discuss the discharge of one of its employees, William Franklin. Although the Health Center maintains it at all times acted in good faith in its refusal to do so, substantial evidence on the record as a whole supports the Board's order, if the Board was not otherwise precluded from exercising jurisdiction over the Health Center as an "employer" under the Act. The Center asserts that it is exempt from the Board's jurisdiction since HEW has substantial control over its labor relations and the Center cannot engage in meaningful collective bargaining. We must respectfully disagree; we enforce the order of the Board.

1. Service and Hospital Employees Union, Local Union No. 50, affiliated with Service Employ-ees International Union, AFL–CIO.

The Health Center is a non–profit corporation which provides health services for residents in St. Louis County. From its incorporation in 1969 until 1977 government funds were given to the Center by the Human Development Center (HDC), a non–profit corporation operating an anti–poverty program in St. Louis. Since 1977 the Health Center has received its funding direct from HEW. In March 1977 the Service and Hospital Employees Union, Local Union No. 50 sought certification as the exclusive bargaining representative of all employees at the Center. Separate elections were held and the Union was elected as bargaining representative of both the clinical employees and the technical employees. Thereafter on successive dates commencing in July 1977, the Union sought to meet with the Center Project Director over the discharge of a Center employee and to negotiate an agreement covering wages, hours and working conditions. It also requested certain information from the Center to facilitate negotiations. On September 30 a general policy statement was drafted by the Project Center and sent to HEW requesting a position statement from HEW before the Center would meet with the Union. The Union was not given a copy of the statement. The policy statement stated that the Center did not oppose the principle of collective bargaining but that it believed that government regulations and restrictions could be impediments to collective bargaining and that it would seek advance clearance from appropriate agencies on all matters which might affect the Center's funding. On November 10 the Center Director stated that Center representatives would meet with the Union but would not discuss substantive issues until HEW responded to the policy statement. On December 7 a meeting was held, but the Center's labor relations committee admittedly had no authority to bargain at that time. On December 13 HEW responded to the Center's request stating:

We have reviewed the documents you submitted relative to representation of your employees by a Union.... [W]e have had very limited experience in the area of collective bargaining relative to project personnel. Accordingly, we can offer only limited guidance. We would remind you, however, that once the Public Health Service awards its allotted funds to its various grantees, the total amount awarded generally remains constant. Only rarely do supplemental funds become available. Therefore, in the event of a future agreement that would require an increase in the funding level, you may find it necessary to develop an additional source of funds.

Thereafter the Union again attempted to meet with the Center without success. The unfair labor practice charges followed.

The Board enforced an ALJ finding that the Center possessed the right to control its employees and ordered it to cease and desist from the unfair labor practices. It ordered the Center to bargain with the Union and to supply the requested information.

2. Prior to the adoption of the right of control test the NLRB relied on a two–tier test as articulated in *Rural Fire Protection Co.*, 216 NLRB 95, 88 LRRM 1305 (1975). That test involved determining whether: (1) whether the nonexempt employer retains sufficient control over its employees' terms and conditions of employment so as to be capable of effective bargaining; and (2) if such control existed, whether there was an intimate connection between the purposes of the exempt institution and the services provided by the nonexempt employer.

3. The language of section 2(7) of the Act (29 U.S.C. § 152(7)) granting the NLRB jurisdiction over "persons ... affecting commerce" is accorded the broadest possible interpretation. *NLRB v. Reliance Fuel Oil Corp.*, 371 U.S. 224, 226, 83 S.Ct. 312, 313, 9 L.Ed.2d 279 (1963). Employer, as defined under the Act, specifically excludes "... the United States or any wholly owned Government corporation or any Federal Reserve Bank, or any State or political subdivision thereof...." The Center asserts that it comes within the exemption. The Center, a not -for--profit Missouri corporation, is in no way affiliated with state or federal government other than as the recipient of a grant from HEW.

■ In a recent decision, *National Transportation Serv., Inc.*, 240 N.L.R.B. 64, 100 LRRM 1263 (1979), the NLRB established a new standard [2] for determining when jurisdiction should be exercised over non–exempt employers. In *National Transportation* the board adopted the "right of control" test which raises only the question of whether or not the non–exempt employer is able to bargain effectively about the terms and conditions of employment so as to be capable of effective bargaining with the employees' representative.[3]

■ The Center urges that *Lutheran Welfare Services of Illinois v. NLRB*, 607 F.2d 777 (7th Cir. 1979) should control this case. In *Lutheran Welfare* the court found that the nonprofit Illinois Corporation which operated child care facilities under the federal Headstart program, lacked the necessary control over labor relations to engage in meaningful bargaining. *Id.* at 778. Central to the court's holding in that case was a statutory provision giving the federal agency administering the Headstart program control over salaries, travel allowances and employee benefits.[4] *Id.*

Nor can the Center be viewed as a political subdivision within the parameters of section 2(2). The NLRB has interpreted the term "political subdivision" to include only entities that are either (1) created directly by the state so as to constitute departments or administrative arms of the government or, (2) administered by individuals who are responsible to public officials or the general electorate. *NLRB v. Natural Gas Utility District*, 402 U.S. 600, 604–05, 91 S.Ct. 1746, 1749, 29 L.Ed.2d 206 (1971); *Board of Trustees v. NLRB*, 624 F.2d 177 (10th Cir. 1980); *NLRB v. Austin Developmental Center, Inc.*, 606 F.2d 785, 789 (7th Cir. 1979); *NLRB v. Highview, Inc.*, 590 F.2d 174, 176 (5th Cir. 1979). The Center is obviously not an arm of the federal or state government. Nor do board members serve at the pleasure of public officials or the general electorate. Thus the Center falls within the statutory definition of employer found in § 2(2).

4. 42 U.S.C. § 2928f(a) provides in relevant part:
   Each Headstart agency shall ... adopt for itself and other agencies using funds or exercising authority for which it is responsible, rules designed to establish specific standards governing salaries, salary increases, travel and per diem allowances, and other employee benefits ....

But there are no similar provisions applicable to community health centers funded by HEW. Though similarities exist between *Lutheran Welfare* and this case[5] with regard to reporting requirements there are significant differences in the degree of control exercised by the exempt agency. Both former Center chairwoman Murphy and current chairman, David Outlaw, testified that the board of directors of the Center has primary responsibility for personnel policies, wages and other conditions of employment.[6]

The Center urges that as one of the conditions under its grant, HEW required that "all proposed contracts must be submitted to the Regional Health Administrator for approval *prior* to entering into the agreement." The Center also urges that HEW has in the past directed the Center to employ a particular category of employee and submit the selected applicant for HEW approval prior to employment.

The extent to which HEW may veto any contract, including a collective bargaining agreement is not clear. HEW approval appears to be a condition of the grant, yet the record demonstrates that HEW has no objection to a collective bargaining agreement and that any resulting increase required by it might require the Center "to develop an additional source of funds."

Furthermore, additional HEW regulations applicable to the Center indicate that costs of compensation are allowable under the grant to the extent that they result from labor management agreements so long as they do not exceed the level paid for similar non–government work under comparable circumstances. 45 C.F.R. 74 (App. F § G6(f)).

Although it appears the Center must work within certain restrictions, the record does not disclose that the Center's relationship with HEW precludes it from effectively bargaining with the Union. *See NLRB v. Austin Development Center, Inc.*, 606 F.2d 785, 789 n.8 (7th Cir. 1979). The limitations on the Center serve to define the economic framework with which the Center and the Union may conclude their bargaining. *See H. K. Porter Co. v. NLRB*, 397 U.S. 99, 108–09, 90 S.Ct. 821, 826, 25 L.Ed.2d 146 (1970).

The Center has not demonstrated anything more than an abstract objection. It failed to meet with the Union and to attempt a good faith bargaining relationship. If, in fact, its refusal to reach a bargaining agreement on a specific condition demanded by the Union was based upon its inability to obtain HEW approval or funding, we would be faced with a specific context in which to view HEW's role in supervising the Center. Until such an impasse can be shown there exists substantial evidence on this record that the Center has been guilty of much foot dragging and bad faith delays in failing to meet and bargain with the Union.[7]

---

**5.** In addition to relying on 42 U.S.C. § 2928f(a), the court in *Lutheran Welfare* also focused on the degree of control exercised by the supervisory agency. It noted that:

> (1) all *Headstart* and *Daycare* employees are classified and their salaries set in accordance with the Model Cities–CCUO policy; (2) Model Cities–CCUO approval must be secured before Headstart or Daycare centers may hire or promote employees, grant wages or merit increases, pay fringe benefits or set working hours; (3) LWSI and UCCS must prepare a policy procedure manual for approval by Model Cities–CCUO; (4) Headstart and Daycare centers must submit to Model Cities–CCUO personnel rosters, organizational charts and evaluation reports; and (5) the Headstart and Daycare center directors are supervised by Model Cities–CCUO personnel. 607 F.2d at 778.

**6.** This is reinforced by Public Health Service Regulations which set out the functions and responsibilities of the governing boards of community health centers. 42 C.F.R. § 51c.304(d)(3) provides in relevant part:

> (3) the governing board shall have specific responsibility for:
> (i) Approval for the selection and dismissal of a project director or chief executive officer of the center;
> (ii) Establishing personnel policies and procedures, including selection and dismissal procedures, salary and benefit scales, employee grievance procedures, and equal opportunity practices;

**7.** This is particularly true as it relates to the Center's refusal to meet and discuss the Franklin discharge. There exists no nexus with HEW's alleged supervision and this grievance.

■ We hold the NLRB did not abuse its discretion in exercising its jurisdiction over the Center, *NLRB v. Austin Developmental Center, Inc.*, 606 F.2d 785, 790 (7th Cir. 1979); *Compton v. Nat. Maritime Union*, 533 F.2d 1270, 1275 (1st Cir. 1976); *Herbert Harvey, Inc. v. NLRB*, 424 F.2d 770, 782–83 (D.C. Cir. 1969), and such a decision will not be overturned absent a showing of abuse of discretion. *Highview* at 178, *Herbert Harvey* at 780.

The order of the Board is enforced.