**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**Nursing and Convalescent Home Division, Service Employees International Union, Local No. 50, AFL–CIO, CLC, Intervening Petitioner,**

v.

**PARENTS AND FRIENDS OF THE SPECIALIZED LIVING CENTER, Respondent.**

No. 87–3098.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 30, 1988.

Decided July 10, 1989.

---

Aileen Armstrong, N.L.R.B., Washington, D.C., Jeffrey Demain, Altshuler & Berzon, San Francisco, Cal., William M. Newbury, for petitioner.

Bruce Feldacker, St. Louis, Mo., Jonathon P. Hiatt, Legal Dept. Service Employees Int'l Union, Washington, D.C., for intervening petitioner.

Bettye S. Kitch, Haynes & Boone, Fort Worth, Tex., for respondent.

Before CUDAHY and KANNE, Circuit Judges, and WILL, Senior District Judge.[*]

WILL, Senior District Judge.

This is a petition for review and enforcement of an NLRB order which affirmed the ALJ's decision that the employer was subject to the NLRB's jurisdiction and that it violated the Labor–Management Relations Act ("LMRA"), 29 U.S.C. § 141 *et seq.* (1947), by refusing to negotiate with the union, unilaterally implementing employment changes and threatening employees who had lawfully picketed. The NLRB adopted the ALJ's cease and desist order and modified his affirmative action order.[1] We affirm and order enforcement.

## BACKGROUND

Parents and Friends of the Specialized Living Center ("P & F"), respondent, is a

---

[*] The Honorable Hubert L. Will, Senior Judge of the United States District Court for the Northern District of Illinois, Eastern Division, is sitting by designation.

1. The NLRB's opinion is found at 286 N.L.R.B. 46 (1987).

not-for-profit Illinois corporation. It is licensed and regulated by Illinois and operates an intermediate care facility for one-hundred severely and profoundly retarded adults. The facility was built by the state in 1979 by the Illinois Capital Development Board ("ICDB") as part of a deinstitutionalization effort, pursuant to the Specialized Living Centers Act (the "SLC Act"), Ill. Rev.Stat. ch. 91½, para. 601, *et seq.* (1975). It was first deeded to St. Clair County, which operated the facility from February 1980 through December 31, 1981, after which the facility reverted to the state. Since January 1, 1982, P & F has contracted with the ICDB and the Illinois Department of Mental Health and Developmental Disabilities ("IDMH") to operate the facility.

P & F is managed by a nine-member board which consists of a group of concerned local citizens and parents of the facility's residents. Illinois does not select the directors and has no authority to remove them. Instead, the directors are elected by P & F's corporate members, private individuals who pay a $10.00 annual fee. The facility is managed by an executive director who is hired by the board of directors without state approval. The state only requires that the executive director be a licensed nursing home administrator.

Under the SLC Act para. 603.06, the IDMH "shall adopt and promulgate rules and regulations for the conduct, maintenance and operation of specialized living centers." The contract between Illinois and P & F provides, in part, that P & F is deeded the property and building in exchange for its promise to abide by state laws and regulations. Should P & F fail to satisfy the laws and regulations, the facility and property will revert back to Illinois.

The facility is staffed twenty-four hours per day and, except for the administrative personnel, staffing levels are mandated by state regulations. Employees must meet certain minimum qualifications as determined by Illinois and P & F must maintain certain designated staff/resident ratios (1:4). In addition, a minimum level of direct contact staff must be maintained and the use of volunteers is limited.

State regulations also cover: (1) annual employee physical exams, (2) written personnel policies, (3) minimum qualifications and training for certain positions, (4) employment of certain types of employees by occupation and (5) discipline and discharge procedures.[2] Any labor disputes must be brought to the state's attention and the IDMH Regional Director has recommended that state employees be assigned to the facility if there is a labor strike.

Notwithstanding the above regulations with respect to personnel requirements, P & F is free to make individual hiring, firing and disciplinary decisions. Illinois is not involved in these decisions and P & F has personnel requirements and policies in addition to those promulgated by the state. These include provisions for holidays, vacations, sick pay, leaves of absence, jury duty, insurance, free meals and retirement benefits. The Illinois Department of Public Health ("IDPH") licenses P & F annually based on P & F's annual reports and personnel plans.

The facility receives nearly all of its funding from public sources (approximately 99%), primarily from the Illinois Department of Public Aid ("IDPA"). Funding is on a per diem (client) basis. P & F may not charge its residents for services rendered. P & F must submit annual financial reports and allow the state to audit its records.

Illinois prescribes an hourly mean wage rate which limits the total amount that P & F can pay all of its employees. In other words, P & F can pay individuals a wage higher or lower than the mean wage rate so long as the total wages paid do not exceed the mean wage rate multiplied by the total number of hours compensated. The rate is based on annual cost statements submitted by P & F and other spe-

---

**2.** Required personnel include an occupational therapist, speech therapist, physical therapist, medical records keeper, psychologist physician, registered nurses, licensed practical nurses, mental retardation specialists, activity specialists, licensed administrative employees, training persons and dietary, housekeeping and maintenance personnel.

cialized living centers in the area. The rate is set annually by the IDPA but the state can reduce it at any time, as it did once in 1983.

Unlike the mean wage rate which only limits the total P & F can allocate to wages for virtually all employees, Illinois sets the specific wage rate for P & F's lowest level employees, habilitation technician trainees. The rate for habilitation technician trainees is in effect for their first forty hours of classroom training and eighty hours of on-the-job training. Finally, Illinois imposes a ceiling on fringe benefits: prior to 1985, fringe benefits were limited to 15% of wages while presently P & F may not exceed the 65th percentile for benefits paid by similar employers within the geographic area. Like wages, the total amount available for fringe benefits is set by Illinois but P & F allocates the funds allotted to it.

On July 1, 1982, the Service Employees International Union, Local 50 (the "union"), intervening petitioner, filed an election petition with the NLRB, petitioner, seeking certification as P & F's employees' bargaining representative. At a representation hearing held on July 21 and 23, 1982, P & F presented objections, including a challenge to the NLRB's jurisdiction over P & F based on P & F's impact on interstate commerce and Illinois' control over P & F's operations. On August 12, 1982, the Regional Director held that the NLRB had jurisdiction over P & F.

P & F filed motions to reopen the hearing due to its failure at the representation hearing to articulate additional support for its objection to the NLRB's jurisdiction. The NLRB denied P & F's motions, finding that the evidence was not newly discovered and that special circumstances did not exist. An election was held on September 10, 1982 and the union received a majority of the votes. P & F filed objections to the

conduct of the election but on October 19, 1982, the Regional Director overruled P & F's objections and certified the union.[3] P & F also filed exceptions which were denied on January 10, 1983 and a motion for reconsideration and rehearing en banc which was also denied by the NLRB on February 17, 1983.[4]

The union sent letters to P & F on October 5, 13 and 22, 1982 requesting a meeting to negotiate a collective bargaining agreement. P & F did not respond. On November 12, 1982, the union filed an unfair labor practice charge against P & F. On November 19, 1982, P & F sent a telegram to the union's president advising him that changes had to be made in certain employees' work hours because of: (1) residents' medical needs, (2) a change in the location of a day-training workshop and (3) financial constraints imposed by the Illinois General Assembly effective February 1, 1983. P & F's telegram also stated that

the S.L.C. has refused to recognize the union as the bargaining representative of its service and maintenance employees, and the S.L.C.'s exceptions to the Regional Director's report on objections are pending before the NLRB. Accordingly, the S.L.C. maintains it has no legal duty to bargain with the union over any change in employee wages, hours or working conditions.

. . . . .

[W]ithout waiving its position that it is not required to recognize the union, the S.L.C. is willing to meet and confer with the union concerning required changes, in order to meet legal requirements.

Officials of the S.L.C. will be available to meet and confer with you or your representative on November 22, 23, 24, or 26. Please contact the undersigned to make an appointment. Again, the S.L.C. reiterates that its offer to meet and con-

---

3. The union consists of all full-time and part-time employees of P & F *excluding* licensed practical nurses, managerial employees, business office clericals, professional employees, guards, and supervisors. *See* ALJ Decision, August 17, 1983 at 2.

4. P & F had contested aspects of the election itself but no longer raises those objections. P & F contends that its objections to the union's certifications were not overruled until September 30, 1987 when it was ordered to recognize and bargain with the union. It is clear from the record that the union was certified on October 19, 1982.

fer with the union does not, in any way, constitute 'recognition' of the union or diminish the S.L.C.'s position before the NLRB.

On that basis, the union notified P & F that it refused to meet.

P & F unilaterally instituted a new work schedule for its seven night-shift lab technicians on December 14, 1982. As a result, six of the employees lost between two and ten hours of work per week. Union agents picketed on December 23, 1982 in protest against P & F's award of bonuses to supervisors, denial of bonuses to union employees and refusal to bargain. In response, P & F sent a mailgram to the union which stated in relevant part:

> your Union and/or individuals engaged in such picketing may be liable for all damages suffered by the Parents and Friends of the Specialized Living Center as a result of this illegal picketing as provided by federal law.

On January 17, 1983, the union amended its charge to include allegations that P & F refused to bargain with the certified union over changes in work assignments.

On February 25, 1983 a consolidated complaint was filed alleging that P & F refused to recognize and bargain with the union, a violation of 29 U.S.C. § 158(a)(1) and (5). After March 26, 1983, the work assignments for night-shift lab technicians were restored to the previous schedule. A hearing was held before an ALJ on June 8 and 9, 1983. The ALJ refused to permit P & F to introduce evidence contesting the NLRB's jurisdiction because, as noted above, P & F failed to establish that there was new evidence on this issue or that special circumstances warranted re-litigation of an issue already presented to and resolved by the Regional Director in 1982 during the representation hearing. Transcript from ALJ Hearing, June 8, 1983 at 32–47.

In his decision issued on August 17, 1983, the ALJ concluded that P & F had unlawfully refused to bargain with the union and had unlawfully threatened employees who had picketed. The ALJ also concluded, however, that P & F's change of the work schedules did not violate the LMRA because, according to the ALJ, the changes were in response to "compelling economic considerations and business necessity" and P & F had offered to "meet and confer" with the union but the union rejected P & F's offer. P & F filed exceptions with the NLRB on the jurisdiction issue. On July 25, 1986, nearly three years later, the NLRB remanded the case to the ALJ in light of two NLRB decisions concerning the political subdivision exemption from the NLRB's jurisdiction: *Res Care, Inc.*, 280 N.L.R.B. No. 78, 122 LRRM 1265 (1986) and *Long Stretch Youth Home,* 280 N.L.R.B. No. 79, 122 LRRM 1272 (1986).

A second hearing was held before the same ALJ on October 14, 1986 and he rendered a Supplemental Decision on March 2, 1987 in which he concluded that, in light of *Res Care* and *Long Stretch,* jurisdiction over P & F was proper. On September 30, 1987, the NLRB (voting 2–1) overruled P & F's exceptions to the ALJ's Supplemental Decision and affirmed the ALJ's order that P & F recognize and bargain with the union. The NLRB found that: (1) P & F was subject to the NLRB's jurisdiction and (2) P & F was in violation of the LMRA by refusing to bargain with the union and threatening to take action against employees engaging in lawful picketing. In addition, the NLRB reversed the ALJ and held that P & F violated the LMRA by unilaterally implementing changes in employee work schedules. The NLRB ordered P & F to compensate certain employees for losses sustained. NLRB then-Chairman Donald Dotson dissented from the three-member panel. He wrote that the NLRB lacked jurisdiction over P & F because no showing was made that it has a substantial impact on interstate commerce.

The NLRB then petitioned this court for enforcement of its order. On appeal, P & F again challenges the NLRB's jurisdiction and the NLRB's findings that P & F refused to bargain with the union and unlawfully changed employee work schedules. Assuming the NLRB has jurisdiction, P & F does not challenge the ALJ's finding

adopted by the NLRB that P & F unlawfully threatened employees who had picketed. Finally, P & F argues that the NLRB's petition should be dismissed due to the delay in resolving this case which P & F attributes to the NLRB.

## STANDARD OF REVIEW

■ The NLRB's findings of fact must be upheld if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); *Universal Camera v. N.L.R.B.*, 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951). The NLRB's conclusions of law must be upheld unless they are irrational or inconsistent with the LMRA. *N.L.R.B. v. Financial Institution Employees*, 475 U.S. 192, 202, 106 S.Ct. 1007, 1012, 89 L.Ed.2d 151 (1986).

## ANALYSIS

### *Is P & F Subject to the NLRB's Jurisdiction?*

■ The NLRB's jurisdiction is to be interpreted broadly. *N.L.R.B. v. St. Louis Comprehensive Neighborhood Health Center, Inc.*, 633 F.2d 1268, 1270 n. 3 (8th Cir.1980), *cert. denied*, 454 U.S. 819, 102 S.Ct. 99, 70 L.Ed.2d 89 (1981). In addition, the NLRB's decision to assert jurisdiction "will not be reversed absent a showing that it acted unfairly and caused substantial prejudice to the affected employer." *N.L.R.B. v. Austin Developmental Center, Inc.*, 606 F.2d 785, 790 (7th Cir.1979) (citations omitted).

■ The exemption from jurisdiction relied upon by P & F is that an "employer" subject to the provisions of the LMRA and the NLRB's jurisdiction does not include "any state or political subdivision thereof." 29 U.S.C. § 152(2).[5] The general test for determining whether an employer is an exempt political subdivision is whether or not it was "(1) created directly by the state, so as to constitute departments or administrative arms of the government, or (2) [is] administered by individuals who are responsible to public officials or to the gener-

al electorate." *N.L.R.B. v. Natural Gas Utility Dist. of Hawkins County*, 402 U.S. 600, 604–05, 91 S.Ct. 1746, 1749–50, 29 L.Ed.2d 206 (1971).

P & F does not claim that it is a political subdivision because of the composition of its administration. Indeed, P & F is managed by a board of directors who are chosen by its corporate members, not by the state or general public. Illinois has no authority to hire or fire P & F's directors or executive director.

■ Instead, P & F initially argues that it is beyond the NLRB's jurisdiction because it constitutes an arm of the Illinois state government. In 1978, an Illinois state official prepared a report for the State of Illinois' Purchase Care Rate Review Board prior to the opening of the first Specialized Living Center. In it he wrote:

> As the law requires, SLC's will be operated by 'not-for-profit' agencies and governmental units. However, they do not truly fit the traditional not-for-profit facility concept because of the special circumstances under which SLC's were created. The sponsoring agencies have freely accepted a special partnership with the state and may truly be viewed as quasi-state facilities.

Brief of Respondent at 3 n. 2 (citing R.Ex. 33 at 16–17). This report is a description of the SLC concept rather than a legal requirement that not-for-profit corporations such as P & F must be created by or constitute an arm of the state.

P & F was not created by Illinois and it is not a department or agency of the state. Instead, it has been licensed by the state since 1982 and receives state funding as a not-for-profit corporation. The state created the facility in 1979 but the facility is not the employer. *Compare with Jacobs v. Ohio Valley Regional Transp. Authority*, 636 F.Supp. 841, 842–43 (N.D.W.Va.1986) (public corporation created by state statute and managed by government appointees is not an employer under the LMRA) and *Chicago Teachers Union v. Bd. of Ed. of*

---

**5.** On appeal, P & F does not challenge the NLRB's jurisdiction based on P & F's effect on interstate commerce. Accordingly, that issue is waived.

*Chicago,* 569 F.Supp. 597, 599 (N.D.Ill. 1983) (city board of education was created by state statute, acted as state agency and was thus exempt from the NLRB's jurisdiction).

The facility is managed by a non-profit corporation. Although the services P & F provides are essential to the execution of the SLC Act, P & F is not acting as an arm of the state by providing its services. *See Jefferson County Community Center v. N.L.R.B.,* 732 F.2d 122, 125 (10th Cir.), *cert. denied,* 469 U.S. 1086, 105 S.Ct. 591, 83 L.Ed.2d 701 (1984) (citations and footnote omitted) ("Although the Center may function as an integrated part of a legislative scheme to provide such services, ... it does so not as a state-created department or administrative arm of government, but essentially as a private contractor") and *Brock v. Chicago Zoological Soc'y,* 820 F.2d 909, 911 (7th Cir.1987) (non-profit corporation which operates a public zoo is not an exempt employer under an OSHA regulation governed by the identical LMRA regulation exception). Indeed, if a not-for-profit corporation operates a hospital pursuant to a contract with the state as opposed to a statutory duty, the employer is "not transformed into a political subdivision of the State." *Truman Medical Center, Inc. v. N.L.R.B.,* 641 F.2d 570, 572 (8th Cir.1981). In addition, the fact that P & F conducts its business on state property does not transform P & F into an arm of Illinois. *Morristown–Hamblen Hosp. Ass'n.,* 226 N.L.R.B. 76 (1976).

Finally, P & F claims that facilities for severely retarded adults have traditionally been operated by state and local governments and, as such, are exempt from the NLRB's jurisdiction. However, the NLRB has asserted jurisdiction over entities which, pursuant to state contracts, provide services for the mentally retarded or other 'traditional' recipients of state aid. *See, e.g., Jefferson County Community Center,* (nonprofit corporation providing nonmedical services for mentally retarded and severely handicapped); *Truman Medical Center, Inc.,* (not-for-profit corporation organized to operate a city hospital); and *Crestline Memorial Hosp. Ass'n v. N.L.*

R.B., 668 F.2d 243 (6th Cir.1982) (same). In sum, it is clear that P & F was not "created directly by the state, so as to constitute departments or administrative arms of the government." *Natural Gas Util. Dist.,* 402 U.S. at 604–05, 91 S.Ct. at 1749–50.

### *Is P & F Exempt as a Joint Employer with Illinois?*

▮ Even if P & F does not constitute an arm of the Illinois state government, it could be exempt from the NLRB's jurisdiction based on its relationship with the state. P & F is regulated in part by various Illinois state agencies (IDMH, IDPA, IDPH and ICDB) which, as state subdivisions, are exempt from the NLRB's jurisdiction. 29 U.S.C. § 152(2). If these agencies and P & F constitute "joint employers," *see Stoudt & Son, Inc.,* 114 N.L.R.B. 838, 839 (1955); *N.L.R.B. v. Western Temporary Services, Inc.,* 821 F.2d 1258, 1266–67 (7th Cir.1987) (joint employer concept for two private entities), P & F would be exempt from the NLRB's jurisdiction if the state agencies exerted "a substantial degree of control" over it. *Mississippi City Lines,* 223 N.L.R.B. 11 (1976). *See also St. Jude Indust. Park Bd. v. N.L.R.B.,* 760 F.2d 223, 225–26 (8th Cir.1985); *Golden Day Schools, Inc. v. N.L.R.B.,* 644 F.2d 834, 836 (9th Cir.1981). The NLRB's jurisdiction is not asserted where collective bargaining would be futile. *Museum Assocs. v. N.L.R.B.,* 688 F.2d 1278, 1280 (9th Cir. 1982).

In the context of the political subdivision exemption from the NLRB's jurisdiction, control by a state may be exerted in different degrees and with respect to different factors and must be analyzed on a case-by-case basis. In *Lutheran Welfare Servs. v. N.L.R.B.,* 607 F.2d 777 (7th Cir.1979), we denied enforcement of an NLRB order that had found two non-profit Illinois corporations in violation of the LMRA. The corporations were regulated by Model Cities—Chicago Committee on Urban Opportunity ("CCUO"), a local agency which administered federal funds for local welfare programs (Headstart and Daycare) and which

was exempt from the LMRA since it was a political subdivision of the state. *Id.* at 778.

The degree of control exercised by Model Cities–CCUO over the two non-profit corporations was summarized as follows:

1) all Headstart and Daycare employees are classified and their salaries set in accordance with the Model Cities–CCUO policy; 2) Model Cities–CCUO approval must be secured before Headstart or Daycare centers may hire or promote employees, grant wage or merit increases, pay fringe benefits or set working hours; 3) [the corporations] must prepare a policy procedure manual for approval by Model Cities–CCUO; 4) Headstart and Daycare centers must submit to Model Cities–CCUO personnel rosters, organizational charts and evaluation reports; and 5) the Headstart and Daycare center directors are supervised by Model Cities–CCUO personnel.

*Ibid.* In light of these facts, the corporations and Model Cities–CCUO were "joint employers." *Ibid.* (citing *Stoudt & Son,* 114 N.L.R.B. 838 (1955)). More importantly, the joint employers were both exempt from the LMRA because the local agency "exercise[d] substantial control over labor relations at the Headstart and Daycare centers." *Ibid.* (citing *Mississippi City Lines,* 223 N.L.R.B. 11 (1978)).

In *N.L.R.B. v. Chicago Youth Centers,* 616 F.2d 1028 (7th Cir.1980), we reviewed the same Model Cities—CCUO program at issue in *Lutheran Welfare Services* and reiterated that the "decisive factor" in determining whether a private corporation acting as a joint employer with an exempt public agency is itself exempt from the LMRA is "the extent of the public agency's control over labor relations of the private agency." *Id.* at 1028. The public agency's control over the Chicago Youth Centers was equally substantial. The control was over "funding, . . . job classifications and compensation for each job, and extend[ed] to the minutest details of job performance and other terms and conditions of employment. . . . Because of Model Cities' pervasive control over the labor relations of the

private agencies, any bargaining they conducted would in effect be done on behalf of Model Cities." *Ibid.*

In contrast, we enforced the NLRB's order against the Austin Developmental Center ("ADC"), an Illinois nonprofit corporation which provided educational and counseling services for children. *N.L.R.B. v. Austin Developmental Center, Inc.,* 606 F.2d 785 (7th Cir.1979). ADC contended that it was exempt from the LMRA because of its "intimate connection" with the Chicago Board of Education and IDMH. *Id.* at 788. However, ADC failed to offer evidence of the two-part test outlined in *Natural Gas Util. Dist.* to establish that it was a political subdivision of the state. *Id.* at 789. In addition, we held that the political subdivision exemption is not available to a nonprofit corporation if a public agency merely controls the corporation by limiting its total expenditures. *Id.* at 789 n. 8.

Moreover, we noted that "the 'intimate connection' test is one of the Board's discretionary rules used to decline jurisdiction where the purposes of the Act will be furthered thereby." *Id.* at 790 (citations omitted). To challenge successfully the NLRB's exercise of jurisdiction, the private corporation must show more than an intimate connection—"the services also must be interwoven and integrated with [the exempt agency's] operations." *Ibid.* (citations omitted). In addition, the NLRB has rejected the "intimate connection" test. *Id.* at 790 n. 10 (citing *Nat'l Transp. Serv., Inc.,* 240 N.L.R.B. 565 (1979)). *See also Res Care,* 122 LRRM at 1267–68. In any event, we found that the services provided by ADC were not intimately connected with the state agency's function and that ADC was not "substantial[ly] prejudice[d]" by the NLRB's assertion of jurisdiction. *Austin Developmental,* 606 F.2d at 790–91. ADC retained much discretion over the allocation of funds and selection of administrative and management personnel and employees.

In comparison with these three cases, Illinois clearly does not exercise such substantial control over P & F as to preclude meaningful collective bargaining. P & F

retains much more discretion in terms of decisions regarding wages, benefits and personnel decisions than the private corporations had in *Lutheran Welfare Services* and *Chicago Youth Centers.* P & F can allocate wages and benefits within a set total, with the exception of wages paid to the lowest level employees during their short-term training period. As we noted in *Austin Developmental,* 606 F.2d at 789 n. 8, state control over the total funds available does not exempt the not-for-profit corporation from the LMRA. *See also Res Care,* 122 LRRM at 1269–70 n. 22.

On remand, the ALJ made the following conclusions:

> [T]he only control the [I]DPA exerts is a limitation on wage reimbursement to the result of multiplication of total reimbursable hours worked by the regional mean wage rate. This clearly does not mean that [I]DPA sets maximum reimbursable wage rates for any specific classification other than the aforementioned trainees. Respondent acknowledges in its post-trial brief that there has been no occasion for State officials to disapprove a wage rate paid by Respondent.

> . . . . .

> This does not preclude bargaining on the allocation of reimbursed funds to individual job classifications.

> . . . . .

> The State of Illinois, although it limits the total amount reimbursed for wages and benefits, does not, ... prescribe maximum or minimum wage ranges or the substantive terms of specific employee benefits such as sick leave pay, vacation accrual, and the number of paid holidays ..., nor does [P & F] need prior approval from the State for changes in wages paid to individual employees, with the single exception of those of habilitation technicians in training, or changes in existing benefits. The State's limitations in these matters extend only to the total amounts available for spending thereon.

ALJ Supplemental Decision at 3–4, 6. Moreover, P & F retains virtually unfettered discretion in making hiring, firing and discipline decisions as well as other personnel policies. In addition, P & F's directors are not supervised by the state.

In *Jefferson County Community Center v. N.L.R.B.,* 732 F.2d 122 (10th Cir. 1984), the Jefferson County Community Center ("JCCC") challenged the NLRB's jurisdiction, claiming that it was an exempt employer as a political subdivision of Colorado. JCCC was a nonprofit corporation which operated schools, sheltered workshops and residential facilities for the mentally retarded and severely handicapped. *Id.* at 123. JCCC's operations were conducted pursuant to a state statute designed to address the needs of these disadvantaged people. *Ibid.*

The court first determined that the JCCC was not created by Colorado and did not act as an administrative arm of the state. *Id.* at 124. In addition, the JCCC was not managed by public officials or persons responsible to the state. *Id.* at 125. The court then concluded that the state does not exert "extensive control" over the JCCC which would exempt the JCCC from the NLRB's jurisdiction. The areas of control by the state included the following:

> [T]he Center's primary source of income is derived from contracts with and grants from governmental agencies. Pursuant to these funding agreements, the Center is subject to a multitude of government-imposed restrictions and regulations.... These include administrative and procedural regulations, budget ceilings and restraints, review and oversight of the Center's programs, and a host of standards, guidelines, and specifications directed primarily to the quality of client care provided by the Center, such as staff certification and licensing requirements, mandatory job classifications, program content and eligibility restrictions, and physical plant specifications.

The Center concedes, however, that its Board of Directors has final decision-making authority over the essential terms and conditions of employment, including 'wages, fringe benefits, hiring, firing, staffing, personnel policies, final determination of grievances, and virtually every other aspect of labor relations.'

... These are the 'most important incidents of the employer-employee relationship,' ... and they comprise the 'bread and butter issues of collective bargaining.'

*Id.* at 126–27 (citations omitted).

The facts in *Jefferson County* are nearly identical to those presented here. The JCCC was subject to control by the state over many areas, including funding, staffing and licensing. However, as in our case, the JCCC retained significant discretion to ensure that meaningful collective bargaining was possible. The court in *Jefferson County* made it clear that there are many areas subject to collective bargaining and that control by a government agency over a private corporation's labor relations must be analyzed on a case-by-case basis:

> [T]he jurisdictional test does not require that an employer control all terms and conditions of employment, but only that he retain *enough control to bargain effectively....* Here, it is undisputed that the Center substantially controls the 'basic bargaining subjects,' including wages, benefits, hiring, firing, promotion, discipline, and grievances.... It is therefore capable of effective bargaining.

*Id.* at 127 (citations omitted) (emphasis added). *See also Crestline Memorial Hosp. Ass'n, Inc. v. N.L.R.B.*, 668 F.2d 243 (6th Cir.1982), *St. Jude Indus. Park Bd. v. N.L.R.B.*, 760 F.2d 223, 226 (8th Cir.1985), *N.L.R.B. v. St. Louis Comprehensive Neighborhood Health Center*, 633 F.2d 1268, 1270–71 (8th Cir.1980) and *Puerto Rico Marine Management, Inc. v. Int'l Longshoremen's Ass'n*, 540 F.2d 24, 26 (1st Cir.1976).

■■■ According to P & F, the only way it can engage in meaningful bargaining is if the NLRB alters its definition of good faith bargaining to include pre-determined limitations on wages and benefits. The standard for good faith bargaining is flexible and must be reviewed on a case-by-case basis. *See Kankakee–Iroquois County Employers' Ass'n v. N.L.R.B.*, 825 F.2d 1091, 1093–94 (7th Cir.1987). Good faith bargaining in this case will necessarily recognize that total budget resources are fixed (based on the number of clients serviced). The union cannot demand that P & F make changes which are not possible given limitations placed on it by the state.

As to the state's control over the per diem rate, this constitutes control over the budget limit, not control over individual expenditure tradeoffs or work assignments. P & F utilizes non-bargaining unit employees whose wages could be adjusted (decreased) to compensate for union employees' wages which are above the reimbursement mean. P & F could lose its facility if it failed to comply with the state's laws and regulations. However, Illinois' contractual right of reverter is not automatic and the parties in practice have attempted to resolve their differences.

In addition, P & F retains considerable discretion in hiring and firing individual employees. The state reviews P & F's policies in this regard and imposes numerical requirements on staff levels, thus limiting its ability to fire certain workers and hire an unequal amount of replacements for their positions. However, individual staffing selections are within P & F's discretion. In addition, personnel policies drafted by P & F without state intervention include provisions for holidays, vacations, sick pay, leaves of absence, jury duty, insurance, free meals and retirement benefits. While the state controls staffing levels, P & F retains discretion over individual job assignments and scheduling to fill these ratios. Finally, P & F's obligation to notify the state of any labor disputes does not translate into state control.

We conclude that, like the facts in *Austin Developmental* and *Jefferson County*, P & F can engage in meaningful collective bargaining notwithstanding the extensive control by the state. The areas of labor relations over which P & F enjoys substantial discretion include wage and benefit allocations, personnel policies and decisions to hire, fire and discipline its employees. The union recognizes that P & F is limited in its ability to bargain. However, collective bargaining can clearly be meaningful. Finally, there is no evidence that the NLRB's assertion of jurisdiction is unfair

or will cause substantial prejudice to P & F.

### The Res Care Standard

The NLRB remanded this case to the ALJ to resolve the jurisdiction issue in light of *Res Care*, 122 LRRM 1265 (1986), and *Long Stretch Youth Home*, 122 LRRM 1272 (1986). In *Res Care*, the NLRB reaffirmed and clarified its decision in *National Transportation Service*, 240 N.L.R.B. 565 (1979) which had articulated a test for when the NLRB should assert jurisdiction "over an employer with close ties to an exempt government entity." *Res Care*, 122 LRRM at 1267. An employer as defined in 29 U.S.C. § 152(2) must "retain[ ] sufficient control over the employment conditions of its employees to enable it to engage in 'effective' or 'meaningful' bargaining with a labor organization." *Ibid.*

The NLRB found that cases following *National Transportation Service* inconsistently determined over which areas of "labor relations" the employer must retain sufficient discretion to "bargain meaningfully" and what constitutes substantial control by the government "to have removed or severely restricted such discretion." *Res Care*, 122 LRRM at 1267. The NLRB will "examine closely not only the control over essential terms and conditions of employment retained by the employer, but also the scope and degree of control exercised by the exempt entity over the employer's labor relations, to determine whether the employer in issue is capable of engaging in meaningful bargaining." *Id.* at 1267–68.

Moreover, the NLRB concluded that the primary focus should be on the state's control over wages and fringe benefits. *Id.* at 1268–69. The NLRB "agree[d] with those circuit decisions, however, that have recognized the existence of a core group of 'basic bargaining subjects,' and have held that if an employer retains control over decisions affecting those subjects, meaningful bargaining is possible." *Id.* at 1269 (citing *Jefferson County Community Center*, 732 F.2d 122 (10th Cir.1984), *R.W. Harmon & Sons v. N.L.R.B.*, 664 F.2d 248, 251 (10th Cir.1981) and *N.L.R.B. v. E.C. Atkins & Co.*, 331 U.S. 398, 413, 67 S.Ct. 1265, 1273, 91 L.Ed. 1563 (1947) which reviewed other factors in addition to wages and benefits).[6]

The NLRB refused to exercise jurisdiction in *Res Care* over a not-for-profit corporation which "operate[d] residential job corps centers under a contract with the [Department of Labor]," 122 LRRM at 1266, because the government entity (DOL) had a contractual right to approve the level and ranges of wages and fringe benefits for individual job categories proposed by the employer as well as the right to approve changes in such levels. *Id.* at 1269. In addition, the DOL retained control to approve hiring policies and the actual decisions to hire certain personnel. *Id.* at 1266. However, the thrust of the NLRB's decision in *Res Care* is that jurisdiction will not be asserted over an employer which lacks control over "the primary economic aspects of its relationship with its employees—the setting of *wages and benefits* ..." *Id.* at 1268 (emphasis added).

The NLRB asserted jurisdiction in *Long Stretch* over a nonprofit Maryland corporation engaged in child care. While the state imposes guidelines for wage and benefit levels and limits on the employer's total revenues,

> [t]he State's funding of Long Stretch is not tied directly to proposed expenditures for wages and benefits. The State has little or no control over the setting of salaries, the content of the benefits provided, or the content of other personnel policies, so long as Long Stretch satisfies minimum standards and qualifications. Accordingly, Long Stretch retains substantial control over economic matters

---

6. In *Res Care* the NLRB rejected our joint employer analysis in *Lutheran Welfare* and *Chicago Youth Centers*. 122 LRRM at 1268, nn. 12 & 14. According to the NLRB, it is not necessary to find that the state agency and private corporation are joint employers. The only test is whether or not the state agency enjoys substantial control over the private corporation's labor relations. The NLRB's rejection of our analysis of the joint employer issue, however, does not affect the issues in this case.

which are central to the employer-employee relationship.

122 LRRM at 1276–77 (footnote omitted).

In comparison, the facts in our case are more like those in *Long Stretch* than *Res Care*. The state controls P & F's total budget but substantial and significant discretion is retained by P & F with respect to the allocation of funds and benefits within the budget. Within an annual budget, P & F sets wage and fringe benefit levels for individual job categories.

■ As noted above, control over the employer's total budget is insufficient by itself to exempt it from the NLRB's jurisdiction. *Austin Developmental Center, Inc.*, 606 F.2d at 789 n. 8. *See also N.L.R. B. v. St. Louis Comprehensive Neighborhood Health Center*, 633 F.2d 1268, 1271 (8th Cir.1980). The NLRB recognized this principle in *Res Care*, 122 LRRM at 1269–70 n. 22, and *Long Stretch*, 122 LRRM at 1276 n. 14. Illinois' limited control over wages and benefits is thus insufficient to exempt P & F from the NLRB's jurisdiction.

In addition, P & F retains broad discretion over hiring, firing and disciplinary decisions and setting personnel policies. In *Res Care* and *Long Stretch* the NLRB focused on the government entity's control over a not-for-profit corporation's wages and benefits. The NLRB also agreed in *Res Care*, however, with cases in which control over other areas of labor relations were reviewed in determining whether a not-for-profit corporation was exempt from the LMRA. *Res Care*, 122 LRRM at 1269 and n. 18. Thus, it appears that the NLRB has attempted to establish a standard of review that state control over wages and benefits is the most important factor but that state control over other areas of collective bargaining may be considered.

P & F argues that the *Res Care* standard is a new and incorrect test and, in any event, was misapplied. The NLRB claims that P & F's argument that *Res Care* is

incorrect was not made before the ALJ and is thus not properly on review here. 29 U.S.C. § 160(e); *NLRB v. Rich's Precision Foundry, Inc.*, 667 F.2d 613, 622, 624 (7th Cir.1981). In response, P & F claims that it sufficiently challenged the *Res Care* standard in its exceptions to the ALJ's findings filed with the NLRB.

The union has intervened in this case to argue, among other things, that *Res Care* constitutes an interpretation of the NLRB's discretion to assert jurisdiction which is contrary to the LMRA. The LMRA confers jurisdiction on the NLRB over employers having a substantial effect on interstate commerce. The union challenges the distinction made by the NLRB between its statutory and discretionary standards for jurisdiction involving issues other than a corporation's effect on interstate commerce. *See Res Care*, 122 LRRM at 1270 (Stephens, concurring and dissenting). The union also argues that *Res Care* is contrary to the LMRA because even if a state government has substantial control over an employer with respect to wages and benefits, there may be other areas where bargaining is proper and could be meaningful.[7]

We decline to review the union's challenge to the *Res Care* test regarding the NLRB's statutory versus discretionary jurisdiction. It was not adequately raised before the ALJ and NLRB and it is not necessary to the resolution of this case. Moreover, we need not resolve whether or not the NLRB's holding in *Res Care* is contrary to the LMRA because the NLRB concluded that jurisdiction over P & F was proper even under the more limited test of *Res Care* and we agree with that conclusion. Our holding is based on standards enunciated and developed before *Res Care* and *Long Stretch* but, in any event, is also consistent with the holding of both of those cases. In other words, P & F's discretion in terms of wages and benefits is such that it can engage in meaningful collective bargaining.

---

7. Interestingly, P & F also argues that *Res Care* incorrectly limits the analysis to wages and benefits. P & F's argument, however, is based on its view that the state's control over other areas of labor relations is additional support for finding that the NLRB does not have jurisdiction over P & F.

We also find that P & F's discretion in other areas, such as hiring, firing and personnel policies provides additional issues for meaningful collective bargaining. The ultimate issue is whether or not the government enjoys such substantial control over the private employer so that meaningful collective bargaining cannot occur. It does not.

Review of the NLRB's assertion of jurisdiction or denial of jurisdiction must be on a case-by-case basis. The NLRB's assertion of jurisdiction was proper here since Illinois does not exert substantial control over P & F's labor relations with respect to wages, benefits, decisions to hire, fire and discipline and other personnel matters which would prevent meaningful collective bargaining. Jurisdiction over P & F is not unfair and there is no evidence that it will cause substantial prejudice to P & F.

### Did P & F Violate the LMRA by Unilaterally Implementing Changes?

The NLRB found that P & F violated 29 U.S.C. § 158(a)(1) and (5) by making changes in employees' work schedules without bargaining with the union over the changes. *See American Oil Co. v. N.L.R.B.*, 602 F.2d 184, 186 (8th Cir.1979) (working hours are terms and conditions of employment subject to collective bargaining) and *N.L.R.B. v. Katz*, 369 U.S. 736, 747, 82 S.Ct. 1107, 1114, 8 L.Ed.2d 230 (1962) (unilateral changes "must of necessity obstruct bargaining ...."). It is undisputed that P & F made changes in employees' work schedules without negotiating with the union.

P & F contends that it offered to "meet and confer" with the union, thus satisfying its duty to bargain. The ALJ agreed, and found that P & F's offer to meet and confer was all that was necessary in light of the economic situation. The NLRB reversed the ALJ and found that P & F's offer "was conditional and did not constitute a good-faith offer to which the Union was entitled." *See Brooks, Inc.*, 228 N.L.R.B. 1365, 1366–67 (1977), *enf'd in rele-*

*vant part, N.L.R.B. v. Albion Corp.*, 593 F.2d 936 (10th Cir.1979).

■ The ALJ's conclusion that P & F satisfied its obligation to "meet and confer" over work schedule changes is inconsistent with his conclusion that P & F refused to meet and bargain over wages and benefits. Indeed, with respect to P & F's refusal to bargain over wages and benefits, the ALJ made the following statement:

> With respect to the matters on which it stated a willingness to confer, Respondent's telegram denied any intent to recognize the Union by so conferring, and expressly stated Respondent's position that it had no duty to recognize or bargain with the Union. *A clearer rejection* of any obligation to meet and bargain over employee wages, hours or working conditions *is difficult to imagine,* and such a rejection in the face of the Regional Director's certification is an unlawful refusal to bargain, even though the Board has taken no final action on review.

ALJ Decision, August 17, 1983 at 6 (emphasis added). P & F's position on bargaining over wages, benefits and work assignments was communicated in the same telegram which was replete with statements that it refused to recognize the union or its duty to bargain with the union. The NLRB's finding that P & F's offer to bargain was improperly conditional is supported by substantial evidence.

■ P & F also argues that there were compelling economic factors which justified the change in work schedules and that the ALJ's finding of such a situation was not rejected by the NLRB. Such a situation is an exception to the general rule that an employer who makes unilateral changes pending a decision on union certification objections acts at its peril. *Sundstrand Heat Transfer, Inc. v. N.L.R.B.*, 538 F.2d 1257, 1259 (7th Cir.1976) (citing *Mike O'Connor Chevrolet*, 209 N.L.R.B. 701, 703 (1974), *enforcement denied on other grounds, N.L.R.B. v. Mike O'Connor Chevrolet*, 512 F.2d 684 (8th Cir.1975)). The NLRB argues that the economic considerations claim is not an issue on appeal

because P & F failed to present its argument to the NLRB when it reviewed the ALJ's decision. *Woelke & Romero Framing, Inc. v. N.L.R.B.*, 456 U.S. 645, 666, 102 S.Ct. 2071, 2083, 72 L.Ed.2d 398 (1982). In response, P & F contends that it did not have to raise this issue before the NLRB because the ALJ ruled in its favor and the NLRB's rules do not require that a motion for reconsideration be filed.

 Regardless of the merits of the NLRB's waiver argument, P & F's compelling economic circumstances theory cannot succeed. The theory applies to a situation where an employer makes unilateral changes "during the period that objections to an election are pending and the final determination has not yet been made." *Mike O'Connor*, 209 N.L.R.B. at 703. In other words, the compelling economic circumstances exception to the duty to bargain is not available once a union has been certified. *Sundstrand Heat*, 538 F.2d at 1259 ("the Board did not find the layoff itself a unilateral change in terms and conditions of employment which, though occurring *before certification*, would be determined, *upon certification*, to have been a § 8(a)(5) unfair labor practice") (emphasis added); *N.L.R.B. v. 1199, Nat'l Union of Hosp. And Health Care Employees*, 824 F.2d 318, 319, 321 (4th Cir.1987) ("the union was properly certified and ... the employer's duty to bargain runs from the date of the election.... [T]he *Mike O'Connor* rule ... allows unilateral action *prior to certification* for economic reasons") (citations omitted) (emphasis added).

The union election occurred on September 10, 1982. The union received a majority of the votes cast and P & F timely filed several objections to the election. The Regional Director overruled P & F's objections and certified the union in a written decision dated October 19, 1982. P & F sent its telegram to the union on November 19, 1982 and changed employee work schedules on December 14, 1982. Accordingly, P & F's compelling economic circumstances argument must fail.

We note that following the Regional Director's certification of the union, P & F filed exceptions before the NLRB. The NLRB denied P & F's exceptions on January 10, 1983. The NLRB's decision is contained in a one paragraph mailgram which states that P & F's exceptions "are denied as they raise no substantial issues warranting review or remand for evidentiary hearing." NLRB Exhibit 9–N. P & F filed a motion for reconsideration and hearing en banc which was similarly denied by the NLRB on February 17, 1983. The NLRB's decision simply stated that P & F's motions were "lacking in merit." NLRB Exhibit 9–O.

 We believe that the compelling economic circumstances exception is not extended from the time the Regional Director certified the union to the NLRB's denial of P & F's exceptions. Instead the exception applies while objections to certification are pending but not after the union has been certified. This is because the employer's duty to bargain commences once the union is certified. *See Trinity Steel Co.*, 103 N.L.R.B. 1470, 1472 n. 3 (1953) (employer violated LMRA by refusing to bargain with union on the day union was certified even though NLRB subsequently denied employer's motion for reconsideration of its certification decision); *Harbor Chevrolet Co.*, 93 N.L.R.B. 1326, 1327–28 (1951) (company was liable for refusing to bargain with union once NLRB "passed upon the Company's exceptions to the Regional Director's report overruling objections to the conduct of the representation case election, and certified the Union"); and *Gen. Elec. Co.*, 163 N.L.R.B. 198 (1967) (where union was certified by Regional Director and employer's subsequent petition before NLRB for review of Regional Director's decision was denied, NLRB concluded that employer was liable for acts which occurred following Regional Director's certification order and prior to the NLRB's review of the employer's exceptions). *See also Morio v. North Am. Soccer League*, 501 F.Supp. 633, 639 (S.D.N.Y.), *aff'd*, 632 F.2d 217 (2d Cir.1980) ("Respondents' duty to bargain with the Union arose from the time the Union was certified.... The fact that Respondents were pursuing their right to ap-

peal did not, absent a stay of the Board's order, obviate their duty to bargain with the Union . . .") and *Loose Leaf Hardware, Inc. v. N.L.R.B.*, 748 F.2d 347, 348 (6th Cir.1984) ("An employer's objections to certification do not relieve the employer of its duty to bargain").

The Regional Director's decision dated October 19, 1982 clearly states that the union is certified as of that date. Thus, P & F's compelling economic circumstances argument does not apply to acts occurring after October 19, 1982. *N.L.R.B. v. 1199, Nat'l Union of Hosp. And Health Care Employees*, 824 F.2d at 321 (an employer may take "unilateral action *prior to certification* for economic reasons") (emphasis added).

In any event, P & F's compelling circumstances argument is weak. The situation facing P & F was that the state cut its budget by 7.66% (approximately $10,000 per month) and the facility's advisory physician ordered a change in the daily schedules of residents. Any changes had to be made within the staff requirements set by the state. However, P & F did not effectuate changes until nearly one month after its notice, hardly an emergency which would preclude negotiations.

In sum, we find the NLRB's decision that P & F violated 29 U.S.C. § 158(a)(1) and (5) by unilaterally changing employee work schedules and making an improper conditional offer to negotiate over the changes to be supported by substantial evidence.

### Status of the Union's Representation Petition

P & F claims that the union's representation petition should have been dismissed in the 1986 hearing before the ALJ because by then only 21 of the 103 employees who were eligible voters in 1982 remained employed by P & F. According to P & F, the union most likely no longer represents the wishes of a majority of the employees. A three year delay occurred between the ALJ's first decision (August 19, 1983) and the NLRB's decision (July 1986) in response to the employer's exceptions. This delay was not caused by P & F and, accord-

ing to P & F, as a matter of equity there is no reason to enforce a bargaining order (September 1987) issued five years following the election. P & F moved to dismiss the October 1986 hearing before the ALJ based on the delay. The ALJ denied the motion and P & F's post-trial motion to dismiss. ALJ Supplemental Decision, March 2, 1987 at n. 1.

This case was delayed in large part due to the NLRB's reexamination of the jurisdiction issue and the delay does not excuse P & F's duty to bargain. An employer is obligated to bargain for a reasonable period after certification, usually at least one year. *Brooks v. N.L.R.B.*, 348 U.S. 96, 98, 103–04, 75 S.Ct. 176, 178, 181–82, 99 L.Ed. 125 (1954); *Hotel, Motel And Restaurant Employees v. N.L.R.B.*, 785 F.2d 796, 798–99 (9th Cir.1986). A valid election was conducted and the union won. The union was certified on October 19, 1982. P & F no longer presents any challenges to the conduct of the election itself. The union requested a meeting to negotiate a collective bargaining agreement soon after the election. It is undisputed that P & F has never bargained with the union.

The delay between the ALJ's decision in 1983 and the NLRB's 1986 order "is not a sufficient reason to relieve [P & F] of its duty to bargain." *N.L.R.B. v. Western Temporary Servs.*, 821 F.2d 1258, 1270 (7th Cir.1987). The fact that there has been "post-election employee turnover by itself does not lead to a presumption that a union has lost majority support among the workers." *Ibid. See also N.L.R.B. v. Star Color Plate Serv.*, 843 F.2d 1507 (2d Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 81, 102 L.Ed.2d 58 (1988), where there was a five-year delay between the representation election and NLRB certification. "We believe that frustration of the policies of the [LMRA] is an inevitable result of the egregious administrative delay in this case no matter how we rule. Because we conclude that fewer policies are frustrated by enforcement than by nonenforcement, we choose the former." *Id.* at 1509–10.

Moreover, our case does not involve the extraordinary remedy of the NLRB imposing a *Gissel* bargaining order where a fair representation election was initially not possible in light of the employer's actions. *See N.L.R.B. v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). In such a situation, subsequent employee turnover and a change in the employer's conduct might make a fair and impartial election possible and it may then be proper to remand to the NLRB to see if the *Gissel* "bargaining order is necessary." *Impact Indus., Inc. v. N.L.R.B.*, 847 F.2d 379, 383 (7th Cir.1988). Our case also does not involve challenges to the union's conduct regarding the representation election or to the election itself. *See N.L.R.B. v. Katz*, 701 F.2d 703 (7th Cir.1983). P & F had raised objections but they were overruled by the NLRB and are no longer at issue.

P & F is free to petition the NLRB in good faith for a new election and its employees are free to seek a decertification election if appropriate. *Zim's Foodliner, Inc. v. N.L.R.B.*, 495 F.2d 1131, 1139 (7th Cir.), *cert. denied*, 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 65 (1974). However, "[n]umerous cases hold that employee turnover, standing alone, does not give rise to good faith doubts regarding a union's majority status." *Id.* at 1141. *See also N.L.R.B. v. Stevens Ford, Inc.*, 773 F.2d 468, 474 (2d Cir.1985) ("Bargaining representatives are presumed to have a continuing majority in an existing unit, absent a showing of doubt about status").

While the delay is regrettable and primarily the fault of the NLRB, it is not a basis to deny the NLRB's petition or order a new election. "Contrary presumptions might encourage employers to file unmeritorious motions in the hope of eventually being relieved of their duty to bargain, either through sheer lapse of time or through inevitable employee turnover." *Western Temporary Servs.*, 821 F.2d at 1270. Because of the delay, it might not have been an abuse of discretion for the NLRB to conduct a new representation election. *Jefferson County*, 732 F.2d at 127. However, we decline to remand to the NLRB for a new election and perhaps unnecessarily delay this case any further.

### CONCLUSION

The ALJ and NLRB properly concluded that the NLRB has jurisdiction over P & F. The NLRB's findings that P & F committed unfair labor practices by refusing to recognize or bargain with the union, unilaterally changing employee work schedules and threatening employees who had lawfully picketed are supported by substantial evidence. Finally, we enforce the NLRB's order requiring P & F to pay damages to the employees adversely affected by changes made in their work schedules.

Accordingly, the order of the NLRB is ENFORCED.