NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

POTENTIAL SCHOOL FOR EXCEP-
TIONAL CHILDREN, INC.,
Respondent.

Sonya Davis and Joyce Jones,
Intervening–Petitioners.

No. 87–1562.

United States Court of Appeals,
Seventh Circuit.

Submitted April 20, 1989.*

Decided Aug. 23, 1989.

Paul J. Spielberg, Elliott Moore and Nan-
cy L. Elam, NLRB, Washington, D.C., for
petitioner.

Joel A. D'Alba, Asher, Paralon, Gittler
and Greenfield, Ltd., Chicago, Ill., for inter-
vening-petitioners.

Marilyn F. Longwell, Kerr & Longwell,
Scott A. Creswell, Mass Miller & Joseph-
son, Ltd., Chicago, Ill., for respondent.

Before MANION, and KANNE,
Circuit Judges, and PELL, Senior
Circuit Judge.

PELL, Senior Circuit Judge.

The National Labor Relations Board and
the intervening individuals petition this

---

* After a preliminary examination of the briefs,
  the court notified the parties that it had tenta-
  tively concluded that oral argument would not
  be helpful to the court in this case. The notice
  provided that any party might file a "Statement
  as to Need of Oral Argument." *See* Rule 34(a),
  Fed.R.Civ.P., Circuit Rule 34(f). No such state-
  ment having been filed, the appeal has been
  submitted on the briefs and the record.

court for the enforcement of the Board's order requiring the respondent, Potential School for Exceptional Children ("the School"), to remedy unfair labor practices in which the School was found to have engaged. The sole question presented is that of the Board's jurisdiction over the School.

## I.

The School is a nonprofit organization that receives funding from state of Illinois agencies to operate a special education and therapy program for children. The School also receives funding from the federal government to operate a separate Head Start program. The funds received from these agencies are kept separately and the School operates each program independently of the other. In 1982, the School employed a total of forty-five individuals. Of these, approximately twenty were assigned to work in the School's therapeutic program. The remaining employees were assigned to the Head Start program. This case involves only employees who worked in the therapy program funded by the state.

The Board found that the School violated section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), by threatening and then discharging two psychotherapists because they repeatedly protested about the School's delay in paying their wages and about an announcement of imminent layoffs. The School does not dispute the facts upon which these findings are based or deny that its conduct violated the Act. Instead, the School contends for the first time that the Board lacks jurisdiction over the School's operations because of the funding the School receives from state and federal sources.

## II.

The facts upon which the Board determines it has jurisdiction may be challenged only upon timely exception, in the absence of which the Board's findings are not open to attack in a later proceeding. *St. Anthony's Hosp. Systems v. N.L.R.B.*, 655 F.2d 1028, 1030 (10th Cir.1981), *mod-*

*ified sub nom. Beth Israel Hosp. & Geriatric Center v. N.L.R.B.*, 688 F.2d 697 (10th Cir.1982). The School failed to file any objections to the factual findings regarding jurisdiction; in fact, before the Board's hearing officer, the School admitted sufficient facts existed to establish jurisdiction. Thus, our review of the School's challenge is limited to whether the facts presented in the record support an exercise of the Board's jurisdiction. The Board's finding that it properly exercised jurisdiction must be accorded great weight and the finding will not be disturbed on review unless the Board acted unfairly and caused substantial prejudice to the affected employer. *Staff Builders, Inc. v. N.L.R.B.*, 879 F.2d 1484, 1486 (7th Cir.1989); *N.L.R.B. v. Parents and Friends of the Specialized Living Center*, 879 F.2d 1442, 1448 (7th Cir.1989).

The Board has developed a jurisdictional standard that exempts from the Board's jurisdiction an employer who lacks control over the essential terms and conditions of employment. In *Res–Care, Inc.*, 280 N.L.R.B. No. 78 (1986), and *Long Stretch Youth Home*, 280 N.L.R.B. No. 79 (1986), the Board held that it will decline to assert jurisdiction over a labor dispute involving a private employer which contracts with a government entity if, under the terms of the government contract, the government entity *directly* controls the levels of wages and fringe benefits that the employer can pay to its employees. The Board noted that unless the employer retains control over decisions affecting a core group of "basic bargaining subjects," meaningful bargaining with any union is precluded. In those instances where the employer lacks the final say on key terms and conditions of employment, it would be a wasteful act for the Board to superintend the employers' labor relations and thus the Board will decline to assert jurisdiction over the employer. *See also Correctional Medical Systems*, 289 N.L.R.B. No. 103 (1988).

The School contends that, by virtue of its contractual relationships with federal

and local governments in administering the programs it provides, it is deprived of sufficient control over its labor relations to engage in meaningful collective bargaining and is, therefore, exempt from the Board's jurisdiction. Although the School asserts that the state and federal agencies have assumed pervasive control over the School's labor relations, the record is devoid of any supporting facts. The School mounts two attacks. First, it relies upon this court's finding in *N.L.R.B. v. Chicago Youth Centers*, 616 F.2d 1028, 1029 (7th Cir.1980) and *Lutheran Welfare Services of Illinois v. N.L.R.B.*, 607 F.2d 777, 778 (7th Cir.1979) that the federally funded Head Start program requires significant oversight by federal agencies.[1] However, the unfair labor practice at issue here did not evolve from the School's Head Start program but from the state-funded therapeutic day school program. The School operates this program independently of the Head Start program, staffing it with its own employees and funding it from different revenues. Thus, whatever affect the federal regulations regarding Head Start may have upon the labor relations of the School's Head Start program employees, they have nothing to do with the labor relations of the therapeutic program employees.

Second, the School contends that because it was dependent upon receipt of funds from the state to meet its payroll and other obligations, the state exerted "subtle influence on labor policies." While it appears that the School submits a budget to state agencies and receives a per-diem payment from the agencies each month according to the number of students served in the day care program, there is no evidence that this funding is tied to the School's proposed budget expenditures for wages and benefits. It is now well beyond the limits of reasonable advocacy for an employer to claim that its dependence upon public funds is a basis for limiting the Board's jurisdiction, especially where, as here, the employer retains substantial and significant discretion as to the allocation of funds and benefits within its budget. *See, e.g., Staff Builders*, 879 F.2d at 1487; *Parents and Friends of the Specialized Living Center*, 879 F.2d at 1453–54; *N.L.R.B. v. Austin Developmental Center, Inc.*, 606 F.2d 785, 789 (7th Cir.1979); *N.L.R.B. v. St. Louis Comprehensive Neighborhood Health Center, Inc.*, 633 F.2d 1268, 1271 (8th Cir.1980) (financial limitations placed on employer by virtue of its funding process merely serve to define the economic framework within which the employer and union may conclude their bargaining), *cert. denied*, 454 U.S. 819, 102 S.Ct. 99, 70 L.Ed.2d 89 (1981). The School does not deny that it retains ultimate control over the wage and fringe benefits levels for its employees in the therapeutic program. It simply posits that how it exercises this control is influenced by the funding process. For example, the School claims that

---

1. *Chicago Youth Centers* and *Lutheran Welfare Services* were decided by this court under a "joint employer" analysis. Under the joint employer concept, a private employer would be exempt from the NLRB's jurisdiction if state or federal agencies exerted "a substantial degree of control" over it. In *Lutheran Welfare Services*, we found an employer exempt from the Board's jurisdiction when a state agency exercised substantial control over an employer in setting employees' salaries, fringe benefits, working hours, wage or merit increases, and in the agency's direct supervision of the employees. 607 F.2d at 778. In *Chicago Youth Center*, we again found the state agency's control over the employer pervasive and the employer therefore exempt from the Board's jurisdiction. The agency there exercised control over funding, job classifications, compensation, and other conditions of employment. 616 F.2d at 1028.

Although the Board has since rejected this court's joint employer analysis, *Res–Care*, 280 N.L.R.B. No. 78 nn. 12 & 14, the value of this court's analysis in these cases is by no measure lessened. Under either the *Res–Care* standard or the joint employer analysis, the inquiry is the same: does the public agency enjoy substantial control over the private employer's labor relations. In *Res–Care*, the Board seemingly suggested that state control over wages and benefits should be the primary focus but that state control over other areas of collective bargaining may also be considered. We find this not inconsistent with the standards enunciated in *Chicago Youth Centers* and *Lutheran Welfare Services*. *See, e.g., Parents and Friends of the Specialized Living Center*, 879 F.2d at 1454.

the state agencies' control over the School's labor policies is evidenced by "the linkage of employee performance to the purse strings." Because the state had placed the School on probation for the poor quality of the records the School submitted to the agency, the School contends that employee performance was closely tied to funding which was threatened by this poor performance and thus the School lacked control over labor relations. However, the School admits that it holds final authority over the hiring and firing of all employees. We, therefore, find no logical basis for the School's contention that it "lacked control over labor relations" when the School possessed the authority to discharge employees if it found their performance inadequate and a threat to future funding.

The School's second example of the agencies' purported influence is similarly fallacious. The School alleges that the unfair labor practice with which it is charged would never have occurred had the School timely received its funding from the agency. We hardly think this was the type of "control" over wages contemplated by the Board in *Res–Care. See, e.g., Austin Developmental Center*, 606 F.2d at 791 (the agency's control must be *direct* and *substantial*). The School discharged the employees for engaging in concerted activities protected under Sections 2(2), (6), and (7) of the Labor–Management Relations Act. That these employees' activities related to payment of their wages and lay-offs is merely incidental. The School's attempt to link the unfair labor practice to the School's funding process in an effort to defeat jurisdiction is simply unpersuasive.

Alternatively, the School requests a remand for further inquiry into the relationship it has with state agencies but the School suggests no facts warranting exploration that might alter the Board's findings. We find this request curious in two respects. First, the School's objection to the Board's jurisdiction, raised for the first time in this court after it had exhausted below its arguments directed to the charge itself, smacks of last minute desperation. This, in itself, is not necessarily poor advocacy, but for our second concern. In mounting this last stand, the School has offered nothing but specious arguments as its battle cry. The School failed to allege one fact that arguably would require the Board to decline jurisdiction. Despite the wealth of cases in which the Board has been required to decline jurisdiction, the School has offered only two contentions, both inapposite for its purposes, to support its claim.

We are not unmindful that when this case was before a three member panel of the Board, Chairman Dotson, in dissent, would have remanded to the hearing judge for further consideration of the jurisdictional issue. This approach might seem to have some initial appeal. The issue of control in the particular situation of an exempt entity dealing with a private institution in some phase of its funding has been troublesome, as evidenced by the number of reported cases it has engendered. Apparently, there is some need to lay down, insofar as is possible, precise guidelines for future disposition of similar cases. This case might have provided the vehicle.

But the facts are before us after an invitation, implicit in the chairman's dissent, to set forth specific facts showing its relationship to the funding state agency which allegedly precluded jurisidiction under guidelines already established. It failed to do so and we must decline to conjecture. We do not intend to ignore the basic requirement that an appellant is required to confine itself to the record made below but the School, even though it apparently did not feel it was so bound here, failed to offer any claimed facts which would seem to be cause for further consideration at an evidentiary hearing.

Under the circumstances, the present record sufficiently details the relationship between the School and the state agencies and in the absence of any evidence that the state agencies control wage rates, benefit levels or personnel policies, we conclude that the School's relationship to the state agencies is insufficient to deprive the Board of jurisdiction.

## III.

Accordingly, the order of the Board is ENFORCED.